JACK M. BASS & COMPANY and MRS. POLLY MCKINNEY BASS, Petitioners,

*v.*

BEN C. PARKER, B/N/F BEN F. PARKER, Respondent.

JACK M. BASS & COMPANY and MRS. POLLY MCKINNEY BASS, Petitioners,

*v.*

BEN F. PARKER, Respondent.

(*Nashville,* December Term, 1960.)

Opinion filed March 10, 1961.

STEPHENSON, LACKEY & HOLMAN, Nashville, for petitioners.

DAN MCGUGIN & W. RAYMOND DENNEY, Nashville, for respondents.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

We granted certiorari in this case and have been quite interested in reading the full briefs and the case has been given thorough consideration.

██ Ben C. Parker, who was 19 years of age, was injured on February 22, 1957, while riding a man-lift in the automobile parking garage of the petitioners, who will be referred to hereinafter as defendants and the respondents will be referred to as plaintiffs as in the trial court. These two cases of the injured party and his father were tried to a jury and the verdict and judgment were entered in the trial court for $5,000 and $1,500 respectively and the same were affirmed by the Court of Appeals. The first assignment of error complains of the action of the Court of Appeals in failing to reverse the trial court for submitting the question to the jury as to whether or not the plaintiff Parker was an invitee or a licensee or trespasser and for failure to direct a verdict in favor of defendants. Of course, if there is any material evidence to support the action of submitting the question to the jury, this assignment must be overruled.

The material facts may be stated substantially as follows: This parking garage is located on Church Street just east of and immediately across the alley from the

Noel Hotel in Nashville and the entrance is from Church Street, while the exit is to the alley. The normal course of procedure of the patrons of this garage is that when they drive in from the street they stop near the ticket window which is located about 90 feet from Church Street, obtain a claim check and turn the car over to driver-employees of the garage, who in turn park the cars on one of the ten floors of the building. The driver makes a right angle turn to the right, goes 90 feet to a ramp which leads up to each floor of the building and parks the car on one of the several floors. When the claim check is presented by the patron for recovery of his automobile, a driver goes up on this man-lift, which is a type of elevator, obtains the car, brings it down and delivers it to the owner on the ground floor.

Just around the corner from the office and to the right of the driveway going to the ramp there is a raised walkway a few inches above the floor extending back 60 feet and along same are lavatories for ladies and gentlemen respectively and a regular elevator which is used when it is necessary or desirable to take anybody to the upper floors, but is not normally used by the employee-drivers because there would have to be a regular elevator operator to bring the same up or down as needed; then 20 feet beyond the end of this walkway and slightly recessed in the corner is this man-lift which is designed for the use of employees only. It consists of a continuous belt that runs between the ground floor and the roof both ways; the photograph in the record shows the same as some 15 or 16 inches wide and at intervals has attached to it a step which works as such, whether going up or coming down, and immediately above each of those steps is a handgrip; the belt is supposed to travel at the rate

of 70 feet per minute and alongside of same is a rope which may be pulled to brake the same; above the roof is a little house for the protection of the machinery, which house extends 8 or 10 feet above the level of the roof; this belt operates through a small hole in each floor and the employee riding the same may step off at the designated floor and when the last floor is reached, i. e., the roof on which cars are parked, there is a safety switch which is supposed to operate when as much as 40 lbs of weight rises as much as 2 feet above the level of the roof floor; on this occasion, however, this safety switch failed to work, so that plaintiff was carried up and over the top of the man-lift, thrown against the ceiling and then fell to the floor and suffered severe injuries, principally to his back.

Obviously, this is a dangerous instrumentality, so far as the uninstructed are concerned, and there is a sign nearby which reads "For employees only"; also, alongside the raised walkway above mentioned is a "No Trespassing" sign. All of the witnesses for the plaintiff testified that they did not see those signs but none testified that the signs were not there. One witness went back a few days later and saw the signs.

The evidence showed that from time to time students and other young people attending dances at nearby hotels would patronize this garage. When the dance would end normally about 1 o'clock a.m., naturally a large number would appear for their cars at the same time and while normally in the daytime during the rush hours this garage would have sometimes as many as 10 drivers to handle the automobiles, on these late hours on dance evenings they would have only 3 or 4, because of the

difficulty of obtaining extra help at this hour. As a result, on prior occasions these young men, after waiting as long as they thought they ought to for the delivery of their cars, would go in large numbers up into the garage and obtain their own cars. That happened on this occasion as a result of a dance being held nearby when from 70 to 100 people showed up and there were only 3 attendants on duty; it required from 2½ to 4 minutes, depending on which floor the car was parked on, for an attendant to go up and bring down a car. It was estimated that it would have taken some hour and a half or two hours to obtain all of the automobiles parked there that night by this crowd.

Plaintiff, his date and his friend Biggs and his date came in the plaintiff's father's car and plaintiff for the first time availed himself of the services of this garage; he was a freshman at Vanderbilt University and his home was in Louisville, Kentucky, and he had never been in this garage on any previous occasion. He waited for 25 minutes for his car and having observed that other boys had had their cars delivered to them who had arrived there after he did and having noticed that others had been going up either the ramp or the man-lift without any objection being made by the employees, he and Biggs agreed that plaintiff would walk up the ramp to locate the car and Biggs would go all the way up the man-lift to the top and look on each floor for the car as he came down. Pursuant thereto, plaintiff located the car on the second floor, brought it down and stopped it either just inside the premises or just outside in the alley (the proof in plaintiff's behalf is both ways on this), and then he decided to take the man-lift and go up to the top and come down looking for Biggs. As heretofore stated, he was

hurt when he reached the top floor and the safety brake failed to work.

The evidence further shows that the employees had reported to the gentleman who was on duty at the cashier's window that the young men were swarming in the building but the proof does not disclose whether it was reported to him that any of them were riding the man-lift. In any event, the evidence is clear that nothing was done by him except to tell the employees to tell the young men to get out of the upper floors of the building.

Two insistences are made under this first assignment of error. First, it is insisted that there is no evidence to show under the above statement in any event that the plaintiff was any more than a licensee or a trespasser, because it is insisted that he went beyond the limits of his invitation as a patron or customer. Second, that in any event, if he were an invitee before he obtained his car, he no longer was an invitee when he went back up on the man-lift to look for his friend, Biggs, because it is insisted that was not for the mutual benefit of the parties but for his personal convenience alone.

It is unnecessary to cite the numerous cases for the rule in Tennessee and generally that a duty of ordinary care is owed to an invitee, whereas to licensees or trespassers the only duty of the owner or occupant of premises is not wilfully to injury him or lead him into a trap; and that the status of an invitee continues only so long as (1) he is using such portion of the premises as reasonably comes within the limits of the invitation, (2) during the time the invitation reasonably extends, and (3) for a purpose reasonably intended by the invitation; and that when these limits are exceeded, the status of an

invitee is changed to that of either a licensee or tres-
passer as the case may be. *Brown v. Barber,* 26 Tenn.
App. 534, 174 S.W.2d 298; 65 C.J.S. Negligence sec. 48,
p. 535.

The usual definition of an invitation by implication, as,
of course, would be the only kind of invitation in this
case, is stated in *Chattanooga Warehouse & Cold Storage
Co. v. Anderson,* 141 Tenn. 288, 210 S.W. 153, 154, as
being "Invitation by the owner or occupant is implied by
law, where the person going on the premises does so in
the interest or for the benefit, real or supposed, of such
owner or occupant, or in the matter of mutual interest,
or in the usual course of business, or where the person
injured is present in the performance of duty, official or
otherwise."

Then in 65 C.J.S. Negligence sec. 43, subsec. 3, p. 510,
with reference to an implied invitation, the general rule
is stated thus:

> "An implied invitation is one which is held to be
> extended by reason of the owner or occupant doing
> something to be done which fairly indicates to the
> person entering that his entry and use of the property
> are consistent with the intentions and purposes of the
> owner or occupant, and leads him to believe that the
> use is in accordance with the design for which the place
> is adapted and allowed to be used in mutuality of inter-
> est."

While it may be said that the location and design of
this instrumentality, the man-lift, and the signs indicate
rather clearly that it is not designed for the use of the
public generally, yet it was a question for the jury to
determine whether the conduct of the defendants' agent

in not taking any action to put a stop to the use of the man-lift by these young men amounted to an implied invitation in the sense that their being allowed to obtain their own cars by use of the ramp and the man-lift expedited the re-delivery of the bailed property. It is true, of course, that the evidence shows conclusively that this plaintiff knew nothing about the previous occasions when these young men had used this man-lift and he could not rely on such a custom, if any, but it was for the jury to say whether he had a right to rely on appearances on that particular evening.

If the jury was of the opinion that the conduct of the plaintiff, as well as these other young men, was for the mutual benefit of the garage and the patrons in clearing the garage of the vehicles, then we think the Court of Appeals was correct in stating that when the plaintiff went back to locate Biggs, such act was a part of the same transaction and was likewise for the mutual benefit of the parties in completing the transaction. For these reasons, the first assignment of error is overruled.

The second assignment of error complains of the failure of the Court of Appeals to reverse the action of the trial court in admitting into evidence a certain pamphlet relating to man-lifts and instructing the jury in regard thereto. The witness Crabb, Assistant Chief of the State Department of Labor, Division of Workshops, Factories and Elevators, was permitted to testify that this pamphlet published by the American Society of Mechanical Engineers had been adopted by the Department of Labor over the objection of defendants and had denied the motion to strike same from the record; and that parts of the same have been read to the jury. After considerable controversy, the court finally of its own

motion gave the following special instruction to the jury, i. e., after referring to T.C.A. 50-510, which provides in part that the Commissioner of Labor is authorized to adopt and promulgate rules and regulations with reference to the safety of employees in places where machinery is employed. The Court said:

"It's the Court's duty to charge you gentlemen of the jury that the defendant in this case is not legally bound to abide by the regulations that I have referred to, except insofar as the relationship of employer and employee is concerned. It's been mentioned that there is no count in the declaration in this case charging statutory negligence. Only common law negligence has been charged in the declaration. You will be justified, gentlemen of the jury, in considering these regulations only as a standard of safety. These regulations relate to the degree of caution in the operation of this machinery that a reasonable and prudent person would use. To that extent the motion of the defendant to exclude these regulations has been binding on the defendant is sustained, and I repeat that you are justified in arriving at your verdict in considering these regulations—that is, that have been adopted by the Department of Labor, or the provisions of this safety code—only to the extent that they inform you regarding the standards of safety that an ordinarily prudent person would exercise under similar conditions."

Now the criticism by defendants does not go to the whole statement of this charge but it is said that the court did not go far enough and tell the jury that two essential requirements for admission are (1) it must be evidence of local custom, known to the adverse party, or so general and notorious that it would be known by

48

virtually all, (2) the evidence must meet the general rules of competency, meaning thereby that books and treatises written by experts are not admissible in evidence to prove the truth of the contents but instead an expert must himself be called.

■ It is axiomatic that objections to evidence must be specific and state the ground of claimed inadmissibility. Caruthers' History of a Lawsuit, 7th Ed., Sec. 337, p. 374.

We have carefully read and re-read the objections made and the grounds of the motion to strike from the record the above evidence and we do not find that either of the above grounds was specified. The nearest any objection came when same was offered was on page 78 of the bill of exceptions where counsel for defendants said that there is no proof that it had been adopted by the Department of Labor or enacted into law and that it "is just a pamphlet put out by somebody not connected with our jurisdiction whatsoever, and has no force here."; at the bottom of page 81 and top of 82 counsel said "explaining some insurance companies and engineers and what not adopt some standards that they think are sound, that doesn't have anything to do, if your Honor please, with administration of justice in court—that is, lawsuits. There could be a question as to whether people observe that or don't observe it, and they have nothing to do, they have no force or effect of any kind." Then after the same had been introduced in evidence and parts of it read to the jury, there was a motion, p. 144, to strike for two reasons: "One, that it shows on its face that this so-called code or manual, applies to the construction, maintenance, inspection and operation of man-lifts in relation to accident hazards to employees, and it has no

reference whatever, if your Honor please, to persons other than employees.

"I further want to move that it be stricken and not considered in anyway, if your Honor please, because under the statutes of the State of Tennessee, the Department of the Commissioner of Safety and no authority under the Code sections mentioned by the witness or any other Code sections, to adopt any such provisions as these."

Such being the state of the record, we cannot consider these grounds of objection to this evidence. The assignment must be overruled.

In view of the finding of the jury that the plaintiff was an invitee, it becomes unnecessary to discuss assignments 3, 4, 5 and 6 and we think that the special request in assignment 8, which was refused by the trial judge, was properly overruled as being adequately covered in the general charge.

Under assignment 7 we think that it was error to charge on the discovered peril doctrine as the same exists in Tennessee, because there is no evidence to show that the defendants knew that this plaintiff was riding the man-lift or that he had any intention of riding it. Moreover, even if the doctrine were applicable in this case mere knowledge on the part of the defendant that this plaintiff was riding the man-lift and, therefore, in a position that might become dangerous upon the happening of some contingency, such as the failure of the automatic switch cutoff to work, would not impose any duty on the defendants to anticipate any such mechanical failure, since there is no evidence that the defendant had any

reason to believe the switch would not work. *Buckner v. Southern Ry.*, 20 Tenn. App. 212, 96 S.W.2d 600.

We cannot see, however, how this could have been prejudicial and reversible error, in view of the evidence of original and primary evidence of negligence of defendants.

The judgment of the Court of Appeals is accordingly affirmed.

All concur.