## DEMPSTER BROTHERS, INCORPORATED v. FAY B. DUNCAN, widow and next of kin of Jim David Duncan. —452 S.W.2d 902.

Eastern Section.  August 5, 1969.

Certiorari Denied by Supreme Court December 1, 1969.

Frantz, McConnell & Seymour, Knoxville, for appellant.

Paul E. Dunn, Knoxville, Morgan & Garner, Chattanooga, for appellee.

COOPER, J. Mrs. Fay B. Duncan sued Dempster Brothers, Inc., for damages for the wrongful death of her husband, J. D. Duncan, who died from injuries received in a fall from a crane ladder in the Dempster plant in Knoxville.

Mr. Duncan, an employee of the Kalthoff Heating and Sheet Metal Company, was on defendant's premises under instructions from his employer to relocate and vent several gas space heaters. Mrs. Duncan averred that her husband, in the course of his assigned task, climbed a stationary steel ladder normally used to give access to an overhead crane; that, while on the ladder, he came in contact with an electrically charged rail or angle iron used to provide power to the crane and was knocked from

the ladder to the concrete floor of the building. Mrs. Duncan charged, in substance, that the defendant was negligent (1) in continuing to maintain the electric current through the rail when it knew the task assigned Mr. Duncan would require him to work in close proximity to the charged rails, (2) in failing warn Mr. Duncan of the electrically charged rails, and (3) in failing to mark or identify the rail as carrying an electric current.

The defendant, in its special pleas, denied all allegations of negligence and plead contributory negligence on the part of Mr. Duncan. Subsequently, the defendant amended its special plea to charge that the invitation to be on the premises of Dempster, extended to Mr. Duncan as an employee of Kalthoff, did not extend to use of the crane ladder, and that Mr. Duncan was a trespasser at the time he received the injury which caused his death.

On trial, the jury returned a verdict for the plaintiff in the amount of $100,000.00. The trial judge, on overruling defendant's motion for a new trial, approved the verdict and entered judgment accordingly.

On appeal, the defendant insists that there is no material evidence in the record tending to show that the defendant was guilty of any act of negligence which proximately caused J. D. Duncan's death, and that the evidence shows, without dispute, that Mr. Duncan was the author of his own misfortune.

In considering these issues, our review of the evidence is "governed by the rule, safeguarding the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all

reasonable inferences to sustain the verdict." D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 508, 206 S.W.2d 897, 901 and cases there cited.

When so reviewed, the record reveals that the defendant converted a shipping and parts storage building into a building to be used for the final assembly of the "Dumpmaster," a type of heavy equipment manufactured by Dempster. The converted building is 100 feet long (running north and south), and is 130 feet wide (running east and west). The building is of steel construction, with the roof and super-structure of the building being supported by 12 steel columns or I-beams spaced along either side of the center bay of the building.

The center bay, which is 65 feet wide, is considerably higher than the two outer bays or wings. An electrically operated overhead crane, which could traverse the entire length of the building from north to south, was installed in the center bay. The crane operated on a 440-volt current which passed through 3 rails, or angle irons, mounted along the west or inner side of the steel columns standing along the east side of the center bay. The lowest rail was approximately 20 feet above the floor.

Power for all other electrical installations in the assembly building passed through a buss duct or conduit fastened to the same steel columns but on the side opposite to the rails. The buss duct also carried a 440-volt current.

Access to the crane was by a steel ladder permanently mounted on a steel column on the east side of the center bay. The crane rails or angle irons were so located with respect to the ladder that, according to Professor Hobart Myer Scull,

"* * * [I]f you climbed up that ladder, and then started to climb higher, there was one pipe in there to grab, but if you tried to go higher than that, these steel angles were a natural thing to grab. They almost looked like a hand-hold put there for that purpose."

A panel or wire screen was mounted on the crane cab to keep the crane operator from coming into contact with the electrically charged rails while entering or leaving the crane cab or while operating the crane. This protection moved with the crane, leaving the electrically charged rails uncovered when the crane was at a site other than its terminus. There were no signs at the site of the permanent ladder warning that an electrical current passed through the rails, nor were there any signs restricting the use of the ladder. Neither was the rail carrying the electrical current marked in any way.

The conversion of the building to a new use by Dempster necessitated changes in the building's heating system. Defendant contacted Kalthoff, the decedent's employer, and contracted with him to relocate the gas space heaters then in the building, to install two additional heaters, and to vent all heaters in the building so that the gas fumes would be exhausted into the upper part of the center bay at a point higher than the crane cab. It was understood generally that Kalthoff would furnish tools and equipment necessary to complete his contract; however, Kalthoff was free to use Dempster's equipment as a matter of convenience.

Kalthoff's contract called for the heaters to be mounted on the north side of designated steel support columns, with the vent pipes to go up the east side of the column through the narrow space between the column and the

side of the middle bay as it rose above the side bays. The vents then would be on the opposite side of the support column from the charged rail, and on the side where the buss duct was located. One of the columns designated as the support for a heater was the column to which the permanent steel ladder giving access to the crane was located.

J. D. Duncan and his helper, working together, mounted the heaters on the designated support columns, including the column to which the crane-access ladder was attached. Duncan then climbed the access ladder, ostensibly to survey the upper reaches of the middle bay prior to extending the vent pipe into the area, stood on the extreme top rung of the ladder or frame surrounding the ladder, grasped the rail or angle iron, received an electical shock and fell to the floor.

The testimony shows no employee or official of Dempster specifically warned Mr. Duncan that an electrical current flowed through the crane rails, though it was known to Dempster officials that the task assigned Kalthoff Heating and Sheet Metal Company would require Mr. Duncan, or his helper, to work in close proximity to the crane rails and/or the buss duct. It was further shown that on other occasions, when Dempster employees were working in the upper area of the center bay, current to the crane rails was cut off.

James A. Asbury, an employee of Dempster, testified he cautioned Duncan to watch out for the "hot stuff" up there; however, Mr. Asbury admitted he was some 30 feet away from Duncan at the time he made the statement and could not say Duncan heard him.

Mr. Shirley Haun, who was employed by the Wilson Construction Company on Dempster premises, testified he told Mr. Duncan "to watch that hot stuff up there" and "there is a buss duct on this side of the column and 440 volts on the crane rails on the other side." This warning, according to Mr. Haun, was during a moment of by-play or jesting conversation between him and Mr. Duncan.

Mr. Duncan's helper testified he was with Mr. Duncan from the time they began to work at the Dempster plant until the accident, and that no one made any statement to the effect there was high voltage in the area where the vent pipes were to run.

Mr. Kalthoff, Mr. Duncan's employer, was of the opinion he had cautioned Mr. Duncan, generally to be careful while at the Dempster Plant, but could not say he had warned him of the charged rails or buss duct.

■ The status of an employee of an independent contractor, while performing work on the premises of the owner-contractee, is that of an invitee, so long as the employee (1) is using such portion of the premises as reasonably comes within the limits of the invitation, (2) during the time the invitation reasonably extends, and (3) for the purpose reasonably intended by the invitation. If any of these limitations are exceeded, the status of the employee of the independent contractor would be changed to that of either a licensee or trespasser depending upon the circumstances. See Shell Oil Company v. Blanks, 46 Tenn.App. 539, 330 S.W.2d 569; Jack M. Bass & Company v. Parker, 208 Tenn. 38, 343 S.W.2d 879; International Harvester Company v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854.

■■ As the consequence of the classification of an employee of the independent contract as an invitee, the owner-contractee is under the duty to exercise reasonable care to see that the employee has a reasonable safe place in which to work. Shell Oil Company v. Blanks, supra. And, where the worker-contractee, has actual or constructive knowledge of latent or potential dangers on the premises, he " 'owes a duty to give warning of, or use ordinary care to furnish protection against, such dangers to employees of the contractor or subcontractors who are without actual or constructive notice of the dangers.' 57 C.J.S. Master and Servant sec. 606, p. 337.'' Shell Oil Company v. Blanks, supra, 330 S.W.2d 572 at page 572.

■ The owner-contractee's duty arises out of his superior knowledge of the dangerous condition of his premises and he is not liable for injuries sustained from dangers that are obvious, reasonably apparent or as well known to the invitee as to the owner. Kendall Oil Company v. Payne, 41 Tenn.App. 201, 293 S.W.2d 40; Illinois Cent. Railway Co. v. Nichols, 173 Tenn. 602, 118 S.W.2d 213; Park v. Sinclair Refining Co., 24 Tenn.App. 204, 142 S.W.2d 321.

Stripped to its basics, the defendant predicates its defense against liability in this case on four principal grounds. First, the defendant insists that the permanent crane-access ladder was outside the limits of the invitation extended to Mr. Duncan in the performance of his assigned work upon defendant's premises and that, as a consequence, Mr. Duncan must be classified as a trespasser at the moment of the accident. Second, that, as Mr. Kalthoff was to furnish necessary tools and equipment to install the heaters, the defendant had no reason to

anticipate that Mr. Duncan would use the access ladder and had no duty to warn him of any danger attendant to the use of the ladder. Third, the defendant insists that the evidence shows Mr. Duncan knew that the crane rails were electrically charged, thus relieving the defendant of any duty to warn him of this fact. Fourth, that Mr. Duncan was guilty of contributory negligence in climbing to the top rung of the crane-access ladder, it being the position of the defendant that even the "do it yourself" homeowner knows this to be dangerous.

We think the issues raised by the defendant in defense of liability were issues to be decided by a jury under the above evidence and that the jury reasonably could find against defendant on all four issues. Specifically, on issues one and two, we can not overlook the fact that the defendant knew a heater was to be installed on the steel column to which the crane access ladder was attached and that the vent pipe was to be extended into the upper part of the center bay. Could not a jury of reasonable men determine that a natural and expected consequence of this would be for a careful workman to use a stationary ladder where available in preference to a movable ladder that can slip or slide? Further, even the defendant must concede that the invitation to Mr. Duncan to work on defendant's premises included permission to work on two sides of the steel support column from which he fell. Could it be said as a matter of law that the invitation to Mr. Duncan to work on the steel column was so restrictive that he was barred from working on the other two sides of the column in the absence of specific instructions to that effect? As to defendant's third contention, while there is evidence in the record that Mr. Duncan was warned that the crane rails con-

tained an electrical charge, there is also evidence to the contrary—thus making this issue one for the jury. We are also of the opinion that it was for the jury to say whether or not Mr. Duncan was guilty of contributory negligence in climbing to the top rung of the ladder where the rails or angle irons were so located with respect to the ladder that they "looked like a hand-hold put there" to be used by one climbing to the top of the ladder.

In conclusion, we think there is material evidence in the record from which the jury reasonably could find that Mr. Duncan was an invitee on premises of the defendant at the time he received the injury causing his death, and that the defendant breached the duty it owed Mr. Duncan (1) in failing to shut off the electricity to the crane rails while Mr. Duncan was performing the work assigned to him, and (2) in failing to warn Mr. Duncan of the danger attendant to working in proximity to the crane rails and the buss duct while current was on.

The defendant's second assignment of error is directed to the statement of the trial judge in his charge to the jury that: "* * * If you find that the decedent was expressly or impliedly in the area due to the heater relocation, then, of course, he would not be a trespasser, and then you would determine the case as to the law dealing with invitees, which I have just previously given you. If you find that he was not expressly or impliedly in the area, due to the heater relocation, then he would be a trespasser, and you would deal with the law of trespassers that the court has previously given you."

The defendant insists that the court's charge is erroneous in that it fails to point out that Mr. Duncan's

classification or status as either a trespasser or invitee while on the ladder was dependent upon whether Mr. Duncan "was in the area (or on the ladder) *'at the express or implied invitation of Dempster Brothers, Inc.'* in connection with the heater relocation."

Admittedly the quoted charge could have been more explicit on the question of invitation and its effect on the classification or status of Mr. Duncan at the time of his fatal accident. However, we see no prejudical error in the above quoted instruction when it is considered in context with prior instruction that:

"It is admitted that Mr. Duncan was an invitee on the premises at the time of his fatal injury, but the defendant says that he was not in the area that he was authorized to be when he suffered a fatal injury. In other words, the defendants say—it is their theory—that he was a trespasser. The duty owed by an owner or occupant of premises to an invitee for his safety is measured and limited by the nature of the invitation held out. His or its liability is only coextensive with the invitation, and to entitle a person to recover for injuries or death on the basis of a duty owed to him as an invitee, he must show that at the time of the injury he was using the premises contemplated by the invitation. The duty of the proprietor of a place of business to the invitee does not require him to render safe for his use parts of the building reserved for use by him and his employees unless he expressly or impliedly invites or induces one to enter such a reserved part."

The defendant insists also that (1) the trial judge, in charging the jury, overemphasized the theory of the plaintiff and minimized the defenses relied on by the

defendant to defendant's detriment, (2) that the trial judge erred in refusing to amplify his statement of defendant's theory, and (3) that remarks made by the trial judge in the course of his charge indicated a feeling of contempt on his part for the efforts of counsel to secure a complete and fair statement of the case for the jury.

We found nothing in the instructions to the jury which would tend to indicate that the trial judge favored the plaintiff over the defendant or that the trial court had a feeling of contempt toward defendant or its counsel. To the contrary, on reading the instructions to the jury in their entirety with special emphasis on those areas cited by defendant in support of its assignments, we find that the trial judge fairly and adequately stated the issues and the applicable rules of law.

It should be noted also that the trial judge gave counsel the opportunity to submit instructions to the court for submission to the jury, and that, so far as reflected by the bill of exceptions, neither counsel availed himself of the opportunity to do so. As pointed out in All v. John Gerber Co., 36 Tenn.App. 134, 252 S.W.2d 138, "In the absence of a correct request, the Court will not reverse merely for meagerness, inadequacy, etc. alone."

Judgment affirmed. Costs incidental to the appeal are adjudged against the defendant and its surety.

McAmis, P. J., and Parrott, J., concur.