# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 5, 2011 Session

## MICHAEL L. JOHNSON, ET AL. v. TODD FORD

**Appeal from the Chancery Court for McMinn County**
**No. 24609     Jerri S. Bryant, Chancellor**

_____

### No. E2011-00486-COA-R3-CV-FILED-APRIL 12, 2012

_____

Michael L. Johnson and Tammy K. Johnson ("Plaintiffs") purchased from Todd Ford ("Defendant") real property located in Athens, Tennessee containing a house constructed by Defendant ("the House"). Shortly after purchasing the House, Plaintiffs began to experience problems with a leaking and flooding basement. Plaintiffs sued Defendant alleging, among other things, breach of contract, negligent construction, misrepresentation, and violations of the Tennessee Consumer Protection Act. Prior to trial, the Trial Court partially granted Plaintiffs' motion for summary judgment finding that Defendant had violated the Tennessee Consumer Protection Act. The Trial Court held, however, that whether the violation caused damages to Plaintiffs would be submitted to the jury for its determination. After a jury trial, the Trial Court entered judgment upon the jury's verdict finding and holding, _inter alia_, that Defendant breached the parties' contract, and that Plaintiffs were awarded compensatory damages of $50,000 for the breach. The Trial Court also awarded Plaintiffs their attorney's fees and discretionary costs. Plaintiffs appeal to this Court raising issues regarding the jury's failure to find in Plaintiffs' favor with regard to the claims of misrepresentation, damages for Defendant's violation of the Tennessee Consumer Protection Act, punitive damages, and rescission, among other things. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

David L. Dothard, Shelley S. Breeding, and Allison Starnes-Anglea, Knoxville, Tennessee, for the appellants, Michael L. Johnson, and Tammy K. Johnson.

Randy G. Rogers, Athens, Tennessee, for the appellee, Todd Ford.

# OPINION

## Background

Shortly before her marriage, Plaintiff Tammy K. Johnson[1] and Defendant entered into a New Construction Purchase and Sale Agreement ("the Contract") for the purchase of real property and the House. Defendant, who is not a licensed general contractor, constructed the House with the intent to sell it rather than to live in it himself. The real property upon which the House is constructed was the site of a previous house which had been destroyed in a fire and condemned prior to Defendant's purchase of the property. Defendant used a wall from the previous house ("the Old Wall") as a portion of the foundation when he constructed the House. When they purchased the House, Plaintiffs were unaware that Defendant had utilized the Old Wall as a part of the House. The Contract provided that the real property would be deeded to both Ms. Johnson and Plaintiff Michael L. Johnson. Plaintiffs took title in May of 2008, and Mr. Johnson moved into the House shortly thereafter. Ms. Johnson moved into the House after she and Mr. Johnson were married in September of that year.

In October of 2008, Plaintiffs began to experience problems with leaking and flooding in the basement of the House. When they investigated, Plaintiffs discovered the Old Wall. They sued Defendant alleging, among other things, that Defendant had breached the Contract, that Defendant had misrepresented that the House was new construction, and that Defendant had violated the Tennessee Consumer Protection Act because he had acted as a general contractor without a license and because he had represented that the House was new construction. After Plaintiffs were granted partial summary judgment, the case proceeded to trial before a jury on the remaining issues and claims.

Ms. Johnson testified at trial that she believed that Defendant was a licensed contractor. She testified that Defendant had implied that he was a licensed contractor and stated: "He was always talking about the extra houses that he had for sale and that he was building a custom lake home."

Ms. Johnson also testified that the Contract specifically stated it was for new construction. She explained that all the sheetrock was up in the basement and upstairs when she and her husband first looked at the House. She further stated that the Old Wall was covered with sheetrock. Ms. Johnson testified that she noticed a small area of wetness in the

---

[1]Ms. Johnson entered into the Contract prior to her marriage to Mr. Johnson and, therefore, her maiden name appears on the Contract. For purposes of simplicity only, we refer to Ms. Johnson throughout this Opinion using her married name.

basement corner when she and her husband first looked at the House and that she asked Defendant about it. She stated that "[Defendant] told me that once he had the gutters installed and the downspouts installed that it shouldn't be a problem anymore."

Mr. Johnson testified that he thought Defendant was a general contractor, but he never asked Defendant if he was. Mr. Johnson stated: "I certainly thought he was a general contractor. He was certainly acting like one. He was marketing the home for new construction, talked to me about having several homes for sale. I don't know what one is supposed to think." Mr. Johnson stated that Defendant told Mr. Johnson that Defendant had six other houses he was trying to sell.

Mr. Johnson testified that when he and his wife first looked at the House the only wall in the basement that was sheetrocked was the Old Wall. He testified:

The problems we've had out of that wall have been significant.… It was in May, 2009, we were just sitting there, watching TV, winding down the day. It was about ten o'clock in the evening. And all of a sudden, it sounded like someone turned a - - everyone has a water spigot on the outside of their house they turn on for the garden hose.

Well, it sounded like someone had turned that on behind our wall. And it was drowning out the volume from the TV. And so we're flipping out like, what is going on here? This is awful. We had to pull the TV away from the wall. We're scrambling around trying to find buckets and towels and everything. Water is visibly coming out from underneath the baseboards in the basement.

And I don't know what else to say about that. I mean, that's just really rough for somebody to have to deal with. You know, you've got water just sheeting into your house and it's beyond your control. You can't stop it.

So I made the determination that after the first time that happened, we had it happen again, and I made the determination at that point in time that I'm tearing off this sheetrock and we're going to find out where this water is coming from.

I tear down the sheetrock. Lo and behold, there is an old wall. You know, and not just any old wall. It has a substantial crack in it. It doesn't even go all the way up to where the floor joists are running. It's got patchwork

block placed on top of it. It's just - - it's just a disastrous wall. I don't know what else to call it.

Mr. Johnson testified that after they made this discovery, French drains were placed, but the French drains did not solve the problem. He also testified:

> We've put in a rubberized - - I believe [Defendant] said it was something from commercial roofing that he had used before. We used that. I personally wanted to use more of a tar-like membrane, spread that on the wall. That was my preference. I compromised with [Defendant] so we could get something done. Something had to be done to ease the issue.

Mr. Johnson testified that at the time of trial, Plaintiffs still were having water coming in, but he stated it is "nothing like it was." Plaintiffs have lived in the House for over two years, and Mr. Johnson admitted that other than the Old Wall and the water problem, the other two floors of the House are acceptable.

Gail Randolph Dean, the broker with Realty Executives of Cleveland who acted as the buyer's agent representing Plaintiffs when they purchased the House, testified at trial. Ms. Dean stated that the House was listed and sold as new construction. She also testified that Defendant's agent represented that Defendant was a contractor and that Defendant acted as a contractor would have acted when Plaintiffs looked at the House.

Curtis Greg Moore, who had been a licensed general contractor since 1996, testified at trial as an expert witness for Plaintiffs. Mr. Moore testified that he inspected the House the week of trial. Mr. Moore stated that he "looked at the basement portion and the exterior. I've been no farther on the interior than the basement." Mr. Moore explained that he walked around the outside of the House and entered through the basement door.

Mr. Moore described the Old Wall stating:

> The - - what caught my eye was the - - there's a major crack in the wall that runs vertical. I wouldn't say diagonal. It's more of a vertical line than anything. And the separation in the wall. The wall is standing vertical and along the crack in the wall, there's about an inch and a half of separation or it's out of alignment at least an inch and a half in this upper section, and, of course, it gets smaller as it goes down the wall.

This wall (indicating) is probably about six foot in height from the concrete floor up. And there's a couple of courses of block on top of it. I think the basement ceiling is about seven foot tall.

Mr. Moore testified about a photograph introduced as an exhibit at trial stating:

This is the concrete floor (indicating). And this is the block wall, which would be vertical, or on a 90-degree from the floor. The measuring tape is actually going underneath the block, I guess, to measure to see how far it would go before it touched anything. It looks like it's going about an inch and a half under the block wall.

Normally, that block would be touching either the concrete pad or the footing, have full bearing on it. And as you can see, it's been notched - - I don't know if it's time of construction or when this happened, but it is not bearing on anything. And it's the south end support wall of the house.… That interferes with the structural integrity of the block wall.

When asked if he would have built a house using the Old Wall, Mr. Moore stated: "No.… Simply because of the stress fractures separation in the wall, and it goes back to waterproofing the outside of the wall, too many unknowns, and just the integrity of the wall, no way to build a new home on that."

When asked how the damage could be repaired, Mr. Moore stated:

It's not feasible to - - the only way of - - jack the house up, move it out of the way, excavate the foundation over, get rid of it completely and start over and sit the house back on it. It's not logical to do that.

It's a story and a half above the main level. The house is tall. And the expense of moving this house out of the way, putting a new foundation in, it's not logical to do that.

When asked what options Plaintiffs have, Mr. Moore stated: "Right now they're pretty much stuck." He further stated: "It's going to be cheaper to build a new home versus what it would cost to move that house out of the way and doze the foundation over and start again there."

Mr. Moore prepared an estimate of $20,000 to disassemble the House and remove debris, and $207,400 to build a new house from the ground up. Mr. Moore's

estimate included allowances for such things as flooring, cabinets, fixtures, etc. He admitted, when asked, that he never saw any allowances related to the House. Mr. Moore reiterated:

> The only thing to fix this problem, to fix this wall and the block that's - - the bottom course of block on a new home, cut and isn't even touching anything, yeah, to me, in my professional opinion, the only way to fix it is to get rid of it and start over again.

When asked, Mr. Moore admitted that he never went on the first and second floors of the House, only the basement. He also admitted that he did not see any problems with the integrity of the structure of the House looking at it from the outside.

Mr. Moore admitted that he never has done any work on a basement that leaks or has water problems. He stated: "That's why I, B-Dry and other foundation and waterproofing businesses exists [sic]." When asked, Mr. Moore admitted that there are companies that specialize in fixing leaking basements. He further admitted that he did not do any testing of the Old Wall to check for structural integrity although there are tests that he could have done. When asked, Mr. Moore admitted that there probably is something that could be injected into the crack that might stop some of the problem, but he stated: "But that's just a patch. That's not fixing the problem." Mr. Moore admitted that he did not know when the House was built, and he did not know how long Plaintiffs have been living in it.

When asked if there were any cracks in the cinder blocks above the section he testified about, Mr. Moore stated:

> I did not look the wall over from one end to the other. From looking at these pictures - - I don't know how many pictures that they have of these. And I'm sure they may have some pictures here that may address that answer.

> But, as far as me, I did not inspect the wall. After I saw that, I thought - - it just blew me away. And I didn't go to inspecting the wall for cracks anywhere after that.

Mr. Moore admitted that he did not see any indication of water intrusion where the notch was cut out. He did see water stains on the Old Wall.

Defendant testified at trial and admitted that he is not a licensed contractor. Defendant owns a used car lot. He constructs houses as a hobby because he enjoys doing it. Defendant testified that he has built or remodeled approximately 50 homes.

When Defendant purchased the property upon which the House sits there was a burned out condemned house on it. Defendant tore down the condemned house approximately six months after purchasing the property. Defendant owned the property for approximately eight years before he built the House.

Defendant admitted that he left part of the foundation and a wall from the condemned house and used the wall when he constructed the House. Defendant did not tell Plaintiffs the house he was building included a wall from a burned and condemned house. Defendant told Plaintiffs that the House was new construction, and gave Plaintiffs a one year warranty.

Defendant testified about Plaintiffs contacting him when they began to experience problems, and he stated:

> Well, the basement had a leak. We went over and looked at it. And so I put some sealer on it the first time, then it continued to leak. We went over and actually dug out - - if you're looking at the house from Jackson Street, we dug out the left-hand side of the house, excavated all of the dirt away from it, took the driveway out, put rubber flashing on it, glued it to the wall, installed more rock, more French drain, put dirt back on it. I think we sowed grass and strawed it down. Once - - and they called back and said they were having more trouble.
>
> And it had got to that point where we were not discussing it, I guess, as what we should. So I sent an excavator over there and told him to do whatever he wanted done, whatever it took to make them happy, do what it took. And I think they stayed there a day with Mr. Johnson. We scheduled where he could take off work and be there with the guys so they could do what he thought would remedy the problem. Did that.
>
> And I think it pretty much took care of everything until we started getting major rains like what we did following that. And then we had more trouble. And then that's when I think you contacted me…. I never went back after I sent the excavator over there and did what he wanted done. And then, like I said, you called. And that was pretty much the end of it, you know, what I did.

When asked to describe the Old Wall, Defendant stated: "It had a crack, what you saw in the picture there. It had a diagonal crack down on it. It's probably a - - it's either

-7-

10- or 12- inch concrete solid. And then we laid block to it and around." Defendant admitted that sheetrock covered the Old Wall. He also admitted that the Old Wall had graffiti on it.

Defendant testified about potentially replacing the Old Wall stating: "I don't think it needs to be. It's obvious the wall is not leaking at the bottom. It's leaking at the top where the - - mulch, the landscaping and that stuff is. It looks to me like it's leaking maybe three foot down." Defendant does not believe that tearing down the entire House is reasonable.

Gene McConkey, the building inspector for the City of Athens who does code inspections for new construction, testified at trial. Mr. McConkey recalled inspecting the House. Mr. McConkey was aware at the time he did his inspections that the previous house at that site had been condemned. Mr. McConkey went to the property to inspect and verify that the previous house had been demolished, and at Defendant's request, to look at the existing retaining wall and existing slab. Mr. McConkey stated:

> We had looked at the retaining wall, which it did have a crack in it, which the wall still seemed structurally sound. It had shown no movement in the wall in years.… We looked at the wall, which it was - - and I think I'm speaking correct on this - - but I believe it was a poured wall, approximately 10, 12 inches thick. It appears to be structurally sound for the house that he was going to place on it.

> We did look at the slab floor, which it had some cracks and some depressions in it. And I told [Defendant] at that time that a new floor would have to be put down, a new concrete floor, and that support footings would have to be dug.

When asked what he told Defendant about the Old Wall, Mr. McConkey stated: "The retaining wall could be incorporated in it, you know, it just needed to be a little bit built up, you know, raised a little bit, the corner rebuilt."

Mr. McConkey testified that he did several more routine, required inspections of the House during construction, and he agreed that in terms of what is required of contractors, Defendant complied. Mr. McConkey agreed that the job of constructing the House was permitted as new construction. Mr. McConkey did not find any evidence of any lack of structural integrity during his inspections. He also did not see any issues with the incorporation of the Old Wall. When he approved the foundation work, Mr. McConkey did not see anything that led him to believe there would be a problem. When asked if he did

-8-

anything to examine the crack in the Old Wall to see what effect it might have on structural integrity, Mr. McConkey stated: "No, because usually cracks are normal process of the house settling when the original structure could have been built…. [I]n my opinion, I thought they were normal cracks." Mr. McConkey did not recall seeing any graffiti on the Old Wall. Mr. McConkey ultimately signed off that the House met code.

When asked, Mr. McConkey agreed that just because permits are pulled and inspections are passed on a house during construction does not mean that the basement will never leak. In his work as an inspector, Mr. McConkey has seen situations where a house has had a foundation or a part thereof removed and replaced without the house being completely demolished. Mr. McConkey stated that there are companies who specialize in foundation repairs. In the fourteen years Mr. McConkey had been doing his job he never had seen or allowed a permit to be pulled to demolish a house due to a leaking basement.

Mr. McConkey was asked if he had known when he inspected the House during construction that it later would have water problems, would he have done the same thing. Mr. McConkey responded: "I would probably still have done the same thing. And I say that because water issues do pop up in a lot of basements. And there's a lot of factors in how they can occur." When asked, Mr. McConkey admitted there is code about weatherproofing a basement in a new home. When asked how a basement is sealed, he stated: "It can be done several different ways. You know, it could be an internal sealing. It could be an external sealing." Mr. McConkey inspected the basement in the House and found it properly sealed, but could not remember specifically how it was sealed.

After the trial, the Trial Court entered judgment on the jury's verdict on December 2, 2010, *nunc pro tunc* to August 19, 2010, finding and holding, *inter alia*, that Defendant had breached the parties' contract; that Plaintiffs were entitled to an award of $50,000 for Defendant's breach of contract; that Defendant's violation of the Tennessee Consumer Protection Act had not caused damage to Plaintiffs; that Defendant had not made a misrepresentation that caused damage to Plaintiffs; that Plaintiffs were not entitled to punitive damages; that the parties' contract should not be rescinded; and that Plaintiffs were not entitled to attorney's fees.

Plaintiffs filed a motion for judgment notwithstanding the verdict or to alter or amend. After a hearing, the Trial Court entered its order on January 24, 2011 finding and holding:

> The court had previously found that the Defendant in this case violated the Tennessee Consumer Protection Act. [Defendant] violated the act in

representing himself to be a licensed contractor when in fact he was not. In addition, the court finds [Defendant] represented the matter as new construction when it was not. Part of the construction for this home was built using the burned out portion of a building.

Based on the violation of the Tennessee Consumer Protection Act, the court finds that Plaintiffs are therefore entitled to attorney's fees. The Affidavit for attorney's fees in this case requested $19,553.00. $3,600.00 has already been awarded. The court is also awarding an additional $400.00 for today. This makes the total amount attorney's fees judgment [sic] against the Defendant in the amount of $23,553.00. The court further provides that it will award discretionary costs in the amount of $2,046.52. The court finds that [Defendant] did make misrepresentations in this case and that such misrepresentations were unfair and deceptive misrepresentations.

It is therefore ORDERED, ADJUDGED and DECREED that the Judgment is amended to include attorney's fees as an additional judgment against the Defendant in the amount of $23,553.00 and discretionary costs in the amount of $2,046.52, for a total of $25,599.52.

Plaintiffs appeal to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise several issues on appeal: 1) whether there is material evidence to support the jury's verdict that Defendant did not make a misrepresentation that caused damage to Plaintiffs; 2) whether there is material evidence to support the jury's verdict that Defendant's violation of the Tennessee Consumer Protection Act did not cause damage to Plaintiffs; 3) whether the jury erred in failing to award Plaintiffs attorney's fees pursuant to the Contract; 4) whether the question regarding whether Defendant's misrepresentations under the Tennessee Consumer Protection Act were willful or knowing was incorrectly submitted to the jury; 5) whether there is material evidence to support the jury's verdict that Plaintiffs are not entitled to punitive damages; 6) whether the Trial Court erred by submitting the issue of contract rescission to the jury; and, 7) whether a recovery of damages for both breach of contract and violations of the Tennessee Consumer Protection Act is allowable. Plaintiffs also request an award of attorney's fees on appeal.

As our Supreme Court has instructed:

> An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

We first address the issue of whether there is material evidence to support the jury's verdict that Defendant did not make a misrepresentation that caused damage to Plaintiffs. To begin, we note that the question submitted to the jury on the jury questionnaire stated: "Do you find that the Defendant made a misrepresentation that caused damage to the Plaintiffs?" The jury answered this question "No." Given the wording of the question, the jury could either have determined that Defendant did not make a misrepresentation to Plaintiffs, or that a misrepresentation made by Defendant did not cause damage to Plaintiffs, or both.

The record on appeal contains material evidence to support a finding that the damage suffered by Plaintiffs, i.e., the leaking basement, could have occurred even if Defendant were a licensed contractor, or if Defendant had disclosed up-front that he was not a licensed contractor. Furthermore, the record on appeal contains material evidence to support a finding that even in homes that are constructed with entirely new foundation walls, leaking can occur. In addition, the building inspector for the City of Athens, Mr. McConkey, testified that he inspected the Old Wall, that he told Defendant that the Old Wall could be used in the new construction, that he saw no problems with the Old Wall, and that even knowing what he knows today if he could go back he "would probably still have done the same thing [and approved the use of the Old Wall]." Thus, there is material evidence in the record from which the jury could have determined that any misrepresentation made by Defendant was not the cause of any damage that Plaintiffs suffered. We will not reweigh the

-11-

evidence. As there is material evidence in the record to support the jury's finding, we will not set this finding aside.

We next consider whether there is material evidence to support the jury's verdict that Defendant's violation of the Tennessee Consumer Protection Act did not cause damage to Plaintiffs.[2] Prior to trial the Trial Court granted Plaintiffs partial summary judgment holding as a matter of law that Defendant had violated the Tennessee Consumer Protection Act. The jury was asked to determine whether Defendant's violation of the Tennessee Consumer Protection Act caused damage to Plaintiffs, and they answered "No."

We note that the Trial Court stated in its January 24, 2011 order on Plaintiffs' post-trial motion that it previously had found that Defendant did violate the Tennessee Consumer Protection Act by representing himself as a licensed contractor and by representing that the House was new construction when it was not. As discussed above, however, there is material evidence in the record from which the jury could have determined that these violations did not cause Plaintiffs any damages. We will not reweigh the evidence. As there is material evidence to support the jury's finding, we will not set this finding aside.

Next, we consider whether it was error for the jury to fail to award Plaintiffs attorney's fees pursuant to the Contract. In *Cracker Barrel Old Country Store, Inc. v. Epperson*, our Supreme Court explained:

> Tennessee, like most jurisdictions, adheres to the "American rule" for award of attorney fees. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the

---

[2] On the actual jury questionnaire, i.e., the form filled out and signed by the presiding juror, the question submitted to the jury stated: "Do you find that the Defendant's violation of the Tennessee Consumer Protection Act proximately caused damage to the Plaintiffs?" This question comports with the Trial Court's earlier ruling finding that Defendant had violated the Tennessee Consumer Protection Act. The jury answered this question by checking the space marked "No." On the document entitled "Jury Verdict," which was signed by the Trial Court as its judgment, the question with regard to this issue, however, is phrased as "Do you find that Defendant committed an unfair or deceptive practice under the Tennessee Consumer Protection Act that caused damage to Plaintiffs?" We are puzzled as to why the question was phrased in this manner given the Trial Court's earlier ruling. We note, however, that Plaintiffs raised nothing in their post-trial motion concerning the verdict form or the jury instructions. As it is clear that with regard to the claim under the Tennessee Consumer Protection Act the issue of damages only was submitted to the jury, correctly so, we need not consider this perplexity further.

American rule applies, allowing for recovery of such fees in a particular case. *Taylor [v. Fezell]*, 158 S.W.3d [352] at 359 [(Tenn. 2005)]; *John Kohl*, 977 S.W.2d at 534.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (footnote omitted).

In the case now before us on appeal, a contractual provision allows for an award of attorney's fees. Specifically, the Contract provides: "In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees." Plaintiffs filed suit alleging, in part, breach of the Contract. The jury found that Defendant had breached the Contract and awarded Plaintiffs damages for this breach.

The record on appeal contains material evidence that Defendant warranted in the Contract that the construction was new construction, and that Defendant warranted the property against defective workmanship or materials. There is material evidence in the record on appeal from which the jury could have determined that the construction was not new construction, and/or that Defendant did not comply with the warranty. Furthermore, Plaintiffs clearly were the prevailing party with regard to the issue of breach of contract as the jury found in their favor on the issue of breach. Under the Contract, Plaintiffs were entitled to an award of attorney's fees. As such, Plaintiffs were entitled to their attorney's fees pursuant to the Contract.

At this juncture, we note that although Plaintiffs were not awarded their attorney's fees pursuant to the Contract, the Trial Court in its order on Plaintiffs' post-trial motion awarded Plaintiffs all of the attorney's fees that Plaintiffs had requested. The Trial Court awarded Plaintiffs their attorney's fees under the Tennessee Consumer Protection Act. Plaintiffs do not argue on appeal that the award of the *entire* amount of attorney's fees that they requested was somehow unreasonable. Plaintiffs are not entitled to a double award of attorney's fees. Even though it was error for Plaintiffs not to be awarded their attorney's fees pursuant to the Contract, such error is harmless because Plaintiffs *were* awarded the *entire* amount of attorney's fees that they requested and no issue was raised on appeal that those attorney's fees were improperly awarded under the Tennessee Consumer Protection Act.[3]

---

[3]In the argument section of his brief on appeal, Defendant mentions that the award of attorney's fees pursuant to the Tennessee Consumer Protection Act was improper. Unfortunately, Defendant did not properly raise this as an issue on appeal. *See Bunch v. Bunch*, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008) (continued...)

"If the Trial Judge reached the right result for the wrong reason, there is no reversible error." *Robinson v. Currey*, 153 S.W.3d 32, 40 (Tenn. Ct. App. 2004) (quoting *Shutt v. Blount*, 249 S.W.2d 904, 907 (Tenn. 1952)). Given all this, we will not disturb the award of attorney's fees.

With regard to Plaintiffs' remaining issues, numbered 4 through 7 above, Tenn. R. App. P. 3(e) provides, in pertinent part:

> Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e). Although Plaintiffs' post-trial motion was not styled as a motion for new trial, in substance it attempted to attack the jury's verdict by alleging that it was not supported by the evidence. As such, we will err on the side of caution and will treat Plaintiffs' post-trial motion as a motion for new trial. *See Tennessee Farmers Mut. Ins. Co. v. Farmer*, 970 S.W.2d 453, 455 (Tenn. 1998) (stating: "[W]e hold that when determining whether a post-trial motion is one of those designated by the rules of civil and appellate procedure as tolling commencement of the time for filing a notice of appeal, courts must consider the substance of the motion, rather than its form.").

Plaintiffs argue in their reply brief on appeal that they did raise these issues in their post-trial motion. We disagree. Plaintiffs' extremely brief post-trial motion alleges, in pertinent part:

> 3. Plaintiffs aver that they are also entitled to a judgment for claims under the *Tennessee Consumer Protection Act* (TCPA), as well as a judgment for their

---

[3](...continued)
(quoting *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001), which stated: "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals."). As the issue is not properly before us, we will not address it. We note, however, that it would make no difference in the ultimate outcome on appeal as we have held that Plaintiffs were entitled to their attorney fees under their breach of contract claim.

claims of Negligent Construction, Intentional Misrepresentation and Negligent Misrepresentation.

4. This Court granted Plaintiffs' Motion for Summary Judgment finding that Defendant was in violation of the *Tenn. Cons. Prot. Act*. Plaintiffs further aver that Defendant's faulty construction in this matter was such that Defendant's lack of a license caused Plaintiffs' damages in the amount of Two Hundred Forty-Seven Thousand Dollars ($247,000.00).

* * *

**WHEREFORE,** Plaintiffs, Michael L. Johnson and wife, Tammy K. Johnson, pray for the following:

A. That this Court award Plaintiffs a judgment for claims under the *Tennessee Consumer Protection Act*, as well as a judgment for their claims of Negligent Construction, Intentional Misrepresentation and Negligent Misrepresentation;….

As our Supreme Court has instructed:

Although Rule 3(e) requires that the grounds for the motion be "specifically stated," the Rule is silent as to how specific these grounds must be. Decisions from this Court have long stated the standard for specificity as being "as specific and certain as the nature of the error complained of will permit." [*Memphis St. Ry. Co. v.] Johnson*, 114 Tenn. [632] at 643 [(Tenn. 1905)], 88 S.W. at 170; *see also McCormic [v. Smith]*, 659 S.W.2d [804] at 805 [Tenn. 1983)] (acknowledging that *Johnson* has survived the enactment of the Rules). While this standard says little more than does Rule 3(e) itself, several principles may be determined from the Rules and case law as to the degree of specificity needed in a motion for new trial to properly preserve issues for appeal.

First, the motion should contain a concise factual statement of the error, "sufficient to direct the attention of the court and the prevailing party to it." *Johnson*, 114 Tenn. at 644, 88 S.W. at 170- 71. Under this standard, it is clearly improper to simply allege, in general terms, that the trial court committed error, either by taking some action or by admitting or excluding evidence; rather, the motion should identify the specific circumstances giving rise to the alleged error so that it may be reasonably identified in the context

-15-

of the entire trial. *See State v. Ashburn*, 914 S.W.2d 108, 114 (Tenn. Crim. App. 1995)....

\* \* \*

Second, as it is well-settled in law that a general objection is usually not sufficient to assign error, Tenn. R. Evid. 103(a)(1); *Jack M. Bass & Co. v. Parker*, 208 Tenn. 38, 48, 343 S.W.2d 879, 883 (1961), the motion should also contain a specific legal ground alleged for the error. Accordingly, in addition to setting forth a concise statement of the factual grounds, a well-drafted motion for a new trial should also identify, with reasonable clarity, the legal ground upon which the trial court based its actions and contain a concise statement asserting the legal reasons why the court's decision was improper.

*Fahey v. Eldridge*, 46 S.W.3d 138, 142-43 (Tenn. 2001) (footnotes omitted).

None of Plaintiffs' issues numbered 4 through 7 above were specifically stated in Plaintiffs' post-trial motion sufficient to satisfy the standard set out by our Supreme Court as discussed in *Fahey v. Eldridge* and, thus, these issues were waived.

As Plaintiffs did not prevail on appeal, and in the exercise of our discretion, we decline to award Plaintiffs attorney's fees on appeal.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Michael L. Johnson and Tammy K. Johnson, and their surety.

_____
D. MICHAEL SWINEY, JUDGE