ILLINOIS CENT. R. CO. *et al. v.* NICHOLS.

(*Nashville,* December Term, 1937.)

Opinion filed July 2, 1938.

HARRY G. NICHOL and J. G. LACKEY, both of Nashville, for Sidney H. Nichols.

TRABUE, HUME & ARMISTEAD, of Nashville, for Hobbs Banana Co.

SEAY, STOCKELL & EDWARDS and WALKER & HOOKER, all of Nashville, for Nashville, C. & St. L. Ry. Co. and others.

ALBERT W. AKERS, of Nashville, CLINTON H. MCKAY, of Memphis, E. C. CRAIG, of Chicago, Ill., and H. D. MINOR, of Memphis, for Illinois Cent. R. Co.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Nichols sued Illinois Central Railroad Company, Nashville, Chattanooga & St. Louis Railway, Louisville & Nashville Railroad Company and Nashville Terminals

for personal injuries charged to their negligence. The jury found in favor of all defendants, except Illinois Central Railroad Company, and from a judgment for $3,000 against this defendant it appealed. Nichols appealed as to the other defendants. The Court of Appeals affirmed. Petitions for *certiorari* filed by the Railroad and by Nichols have been granted and argument heard. The Court of Appeals thus states the facts:

"On May 29, 1935, the Atlantic Commission Company bought a carload of fresh tomatoes at Crystal Springs, Mississippi, to be shipped to itself as consignee at Nashville, Tennessee. That day or the next the tomatoes (packed in lugs or crates) were loaded at Crystal Springs in a ventilated refrigerator car (I. C. 4827) belonging to the Illinois Central Railroad Company. This car was carried over this company's line from Crystal Springs, Mississippi to Martin, Tennessee, where the Illinois Central Railroad connects with the Nashville, Chattanooga & St. Louis Railway, and from there the car was carried over the latter's line to Nashville. The car arrived at 10:55 A. M. May 31, the consignee, the Atlantic Commission Company, was notified at 12:55 P. M., and at 2:20 P. M. the car was placed on team track 179 at College Street 'for inspection and disposition after inspection'. The Atlantic Commission Company had paid for the tomatoes, and, though the bill of lading was not admitted in evidence, it appears without dispute that the car was shipped under a straight bill of lading to the consignee, the Atlantic Commission Company, and traveled under seals from the loading point to the destination. At 4:30 P. M. May 31 Mr. Graves, the Atlantic Commission Company's Nashville manager, accompanied by Mr. George Hobbs, president of the Hobbs Banana Company,

broke one of the seals to the car, entered, inspected the tomatoes, and sold the entire carload lot to the Hobbs Banana Company. Thereupon the Atlantic Commission Company gave the Nashville, Chattanooga & St. Louis Railway a diversion order (on printed form with the blanks filled in in typewriting), dated June 1, 1935, asking that the car 'be diverted to new consignee Hobbs Banana Co., destination, Nashville, Tenn.,' and stating, 'Hobbs Banana Co. pays all freight charges to date'.

"At 2:30 P. M. June 1, 1935, at the request of the new consignee, the Hobbs Banana Company, the car was placed on the Harrison Street team track for delivery to the Hobbs Banana Company, and this company was notified by the railroad that the car had been so placed. After receiving such notice, the consignee had 'forty-eight hours free time' in which to unload the car before the railroad began to charge demurrage on the car, under the regulations of the Interstate Commerce Commission.

"The Harrison Street yards are located within the limits of Nashville, between Fourth and Fifth Avenues and just south of Harrison Street. Many produce dealers have their places of business near these yards and large quantities of produce are daily brought into these yards. There are about ten tracks with concrete driveways between them so as to enable freight to be unloaded from the railroad cars and loaded directly into trucks of consignees or purchasers of the produce. The N. C. & St. L. Railway has a freight office in these yards to look after the handling of cars here. These yards are owned and operated jointly by the L. & N. Railroad Company and the N. C. & St. L. Railway under the name of the Nashville Terminals. The Hobbs Banana Company was a wholesale produce dealer and its place of business

was near the track in the Harrison Street yards on which the car of tomatoes had been placed by the railroad for delivery to this company.

"For twelve or fourteen years it had been a custom permitted and sanctioned by the railroads for produce dealers or consignees receiving carload lots of produce in the Harrison Street yards to unload the cars by taking their customers into the cars, selling them the produce and delivering it to them directly from the cars into the customers' trucks. By thus using the railroad car as a sales room for selling and delivering the produce directly from the cars, the produce dealer saved the expense and delay of removing the produce from the car to his warehouse; and this custom prevailed in the Harrison Street yards especially with reference to fresh vegetables or perishable produce which must be moved quickly. It appears that a similar custom prevails in Birmingham, Paducah, Chicago, St. Louis, New York, Philadelphia and perhaps other large cities; but the Illinois Central Railroad does not run to Nashville and it was not shown that this company had actual knowledge of this custom.

"Upon purchasing the car of tomatoes the Hobbs Banana Company put its own lock on the car and shortly after the car was placed on the Harrison Street track it began to unload the car by taking its customers to the car and selling and delivering to them the produce directly from the car. At about 5 A. M. June 5, 1935, Nichols, who was a grocery merchant in Nashville, and who had been for several years a customer of the Hobbs Banana Company, came to the Company's warehouse to purchase some tomatoes. Not finding any there satisfactory to him, he was taken to the car by R. E. Hobbs, vice-president of the Hobbs Banana Company, who wished to sell

him some of the tomatoes in the car. Hobbs opened the door of the car and he and Nichols entered. The floor of the car was about five feet above the concrete driveway and entrance was gained by means of an iron step or stirrup fastened underneath the car below the door. The lugs or crates of tomatoes had been packed in each end of the car so as to leave an aisle or open space in the center of the car where the door was located. The bracings by which the crates had been held back from the aisle had been taken out and some of the crates had been taken out of the center, so as to leave a clear space through the center of the car. Hobbs and Nichols were in the car several minutes, opening the crates, inspecting the tomatoes and talking about the price and the quantity which Nichols would purchase. While Hobbs was nailing the tops back on the crates, Nichols was standing on the edge of the false floor in the car near the center of the doorway, with his back to the door and his right hand against the door jam. Preparatory to climbing out of the car, he took his right hand from the door jam, turned his body to the left, but the heel of his left shoe was hung or fastened in the false floor of the car so that his foot could not move, which caused him to fall out the door several feet to the concrete, and his left leg to be twisted so that he suffered serious fractures of both bones of this leg.

"As stated the car was a ventilated refrigerator car. It was so constructed as to allow the air to circulate around the cargo. On the floor proper was a false floor, which consisted of slats running crosswise, fastened on top of timbers resting on the floor and running lengthwise of the car. The timbers were of such thickness as to make five or six inches of open space between the floor

and the slats. The slats were three or four inches wide, and the open spaces between them were on an average of from one-half to one and one-half inches in width. The false floor was made in sections and was removable, each section being about four feet square. The particular section involved herein was exhibited on the trial below and sent up with the transcript. Four photographs of it were also sent up.

"The defects complained of were that what are called in the record slats numbers one and two of this section were old and worn, with their edges rounded or beveled, so that the space between these two slats was about two inches wide at the bottom and about three inches wide at the top. On the timbers to which these slats were fastened were some nail holes and some bent, rusty nails, indicating that there had been a narrow slat in this space between slats numbers one and two, which in some way had been taken out or removed. Across the ends of these slats was a metal bar fastened to the slats by means of wood screws. This bar was not fastened down close to the slats, but was loose so that there was a space of about one-eighth of an inch between the bar and the slats. Also slat number one had a knot in it across its whole width at the point where it was fastened to the timber underneath it, and near where the iron bar was fastened on top of it. Through this knot this slat was cracked entirely across, which made the slat springy so that it would give under weight. The heel of Nichols' left shoe was caught and fastened in this space between slats one and two at the point where the crack in slat number one was and near where the iron bar crossed these two slats. The shoe, in the same condition in which it was immediately following the injury, was exhibited on

the trial below, and was sent up. The heel was a rubber one and had been pulled loose from the sole. The testimony of Nichols is that he was standing about the center of the doorway of the car, with his right hand upon the door jam and his back to the door, facing Hobbs, who was nailing back the tops on the crates of tomatoes, and engaged in discussing the matter of his purchasing some of the tomatoes from Hobbs; that he had not observed the defects in the false floor and was unaware that his heel was hung or caught therein; that, they being ready to leave the car, he took his hand from the door jam, made a motion with his body to the left, in the act of climbing down out of the car; and the fact that his heel was caught and could not move, and the movement of his body caused him to lose his balance and fall out the door several feet to the concrete driveway, violently twisting his left leg, with the result that he suffered comminuted fractures of both bones of this leg.''

The theory of Nichols is that he was an invitee into the car,—express as to the Hobbs Company, implied as to the Railroad Company, and that the floor of the car was defective and unsafe.

The Illinois Central Railroad Company insists that it had no contractual relationship whatever with Nichols, and that he was not its invitee, that if it owed any duty to him it was only as a mere licensee. It also insists that the alleged defect was not sufficient, or so obvious, as to support a charge of actionable negligence, particularly in view of the uses for which the car was designed and put; that if defective it was not chargeable with notice of it, under the circumstances; and that any such defect as may have existed was equally and more apparent to Nichols than to its employees, and that this being so no

liability to him as an invitee arose, Nichols being guilty of contributory negligence as a matter of law.

■ It is apparent that if the Illinois Central Railroad Company is liable at all, the relationship of implied invitee must appear. We find it difficult to discover warrant, on the facts of this case, for extending the doctrine of implied invitee, applied under the general rule with caution, to Nichols, personally unknown to the Railroad Company, and in its car on a personal mission of which it had no notice, at the invitation of a third party, also unknown to the Railroad Company, and who was making a use of the car of which it is not contended the Company ever had any other than constructive notice, based on an alleged custom to which there is no evidence this particular Company, Illinois Central Railroad, had ever been a party. Certainly, moreover, the benefit to this Company was extremely remote, and the use of the car as a salesroom by Hobbs Company and Nichols can hardly be said to have been more than permissive on the part of the Illinois Central Railroad.

In denying responsibility as an invitee counsel for the Railroad further say (1) that after the time the car arrived at Nashville on May 31st and was inspected and accepted by the original and named consignee, Atlantic Commission Company, who broke the seal and turned over the car to Hobbs Banana Company, who in turn took and retained, under lock and key, exclusive possession and control of the interior for the next five days and until the accident, that defendant had no such occupancy and control of the premises,—the inside of this car,—as would support the theory of an implied invitation on its part; and (2) that since the record shows that this car was being held on the yard tracks beyond the time

limit fixed by law for interstate cars, no legal implication can arise that it was being so held by direction of the defendant Company, or that persons were using it as they were doing by its invitation. We have no case extending the doctrine of implied invitee to like facts, and we are cited to none from other jurisdictions. We find no case in which constructive notice only is relied on to establish both the defect in the premises and the invitation to visit them; and where also control over the premises at the time is denied and is in such degree of doubt.

■ ■ But, if this proposition should be conceded, plaintiff is confronted, on the uncontroverted facts, with (1) a lack of evidence that the alleged defect was of a nature and extent which, in the exercise of ordinary care, this Railroad Company was required to discover and remedy, or that the accidental injury to plaintiff was one that might have been reasonably foreseen; and with (2) uncontroverted evidence that such defect as existed was at least equally observable to plaintiff, in the exercise by him of reasonable care for his own safety, as to the Company-owner. And, in considering these issues, it must be borne in mind that (1) in the particular under consideration, the obligation of the Railroad Company is not that high degree of care required of a common carrier to a passenger, but ordinary care only; and that (2) the perfection of condition in which the premises are required to be maintained is in proportion only to the character of the use to which they are intended to be put, and that the primary purpose here was transportation of perishable freight, rather than use as a salesroom.

. ■ ■ In order to impute to the owner knowledge of

a dangerous thing, or place, the danger therefrom must be such as is recognized by common experience, or might reasonably be expected or anticipated by a person of ordinary prudence and foresight. Negligence consists in a failure to provide against the ordinary occurrences of life, and the fact that the provision made (here the ventilated slat floor) is insufficient as against an event such as might happen once in a lifetime (here that this customer for tomatoes would enter this freight car wearing a soft and worn rubber heel, and twist it between the slats, and fall through the car door) does not make out a case of actionable negligence. These rules, thus stated in 20 R. C. L., p. 16, have been announced in numerous opinions cited in the notes. As said by Mr. Justice HOLMES, when on the Massachusetts Court, "If men were held answerable for everything they did which was dangerous in fact, they would be held for all their acts from which harm in fact ensued. The use of the thing must be dangerous according to common experience, at least to the extent that there is a manifest and appreciable chance of harm from what is done, in view either of the actor's knowledge or of his conscious ignorance". *Com.* v. *Pierce,* 138 Mass., 165, 52 Am. Rep., 264. In harmony are the holdings in this State that to render one liable for negligence, it must be shown that the damage was the ordinary or probable consequence of the act, or omission. *Youngstown Bridge Co.* v. *Barnes,* 98 Tenn., 401, 39 S. W., 714; *East Tennessee Railroad Co.* v. *De Armond,* 86 Tenn., 73, 5 S. W., 600, 6 Am. St. Rep., 816; *Weeks v. McNulty,* 101 Tenn., 495, 496, 48 S. W., 809, 43 L. R. A., 185, 70 Am. St. Rep., 693.

Then, on the morning this accident occurred, the interior of this car had been in use by, and under the ex-

clusive control of, the shippers and their successive consignees, for a week or ten days. The crates of tomatoes had been loaded into it at Crystal Springs, Mississippi, where, presumably, the truckmen loading the car had used this flooring safely. Apparently it was accepted for this use by the shippers without any defect being observed. Since arriving in Nashville, where the seal on it had been broken and inspection made and no defect observed by the original consignee, on May 31st, it had been in the exclusive possession and control of the Hobbs Company, using it, day after day, for nearly a week, until June 5th, as a sales room and ripping loose the wooden braces and unloading crates of tomatoes from it, constantly using this slat floor. This use of it was well calculated to wear and impair it, but no one observed any defect whatever. Mr. Hobbs, or his salesmen, and his customers entered and used it daily and observed no defect in it. No other customer got a heel between these slats. And as a necessary predicate of his right of action, of course, Mr. Nichols observed no defect therein.

How can it be consistently said that the servants of this Railroad Company are chargeable with notice of the existence of this alleged defect as of the time when, in Mississippi, they delivered the car to the shippers there? How can it be said that these servants of the Company should have seen and known that which Hobbs, his servants and customers, including plaintiff, were unable to observe? Indeed, it is plausibly urged for the defendant Railroad that a presumption fairly arises on the facts that the cracking or springing and pulling loose of one or more of these slats, made the immediate ground of complaint, is attributable to use of the slat floor in loading and unloading heavy crates, removing braces and

incidental passing over the floor at Crystal Springs and during the week after the car reached Nashville and while its interior was in the exclusive control of Hobbs Company, the second consignee.

It is unnecessary to cite authority for the proposition that mere ownership or occupancy of premises, here a car, does not render one liable for injuries to persons entering them; the owner is not an insurer, even when the visitor is an invitee. Liability is grounded on the *superior knowledge* of the owner of the danger to the invitee. It is when the perilous condition is known to the owner and not known to the person injured that a recovery is permitted. In the language of MR. JUSTICE HARLAN, the owner is liable to his invitees for injuries "occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist, without timely notice to the public, or to those who were likely to act upon such invitation." *Bennett* v. *Louisville, & N. R. Co.,* 102 U. S., 577, 580, 26 L. Ed., 235. We quote this pertinent language from 20 R. C. L., p., 57, citing cases: "It has been said that the phrase 'implied invitation' in its real meaning and significance, as derived from its application to the adjudged cases, imports knowledge by the defendant of the probable use by the plaintiff of the defendant's property so situated and conditioned as to be open to, and likely to be subjected to, such use. And, hence, there is no liability from dangers *that are obvious, or as well known to the person injured as to the owner.*" And, again, on page 107 of the same text book, it is said: "In more familiar form the proposition is as follows: Liability is established when it is shown that the peril, being of the defendant's creation, was

known to the defendant, but not to the person injured; and no liability is predicable of the injury when it appears that *the injured person's knowledge of the danger surpassed or equaled that of the defendant."* We have italicized language, peculiarly applicable to the doctrine of invitee liability, and which has controlling force in the instant case. In our opinion, the minds of intelligent and reasonable men could not differ on the proposition that Mr. Nichols is at least equally with the defendant Railroad Company chargeable with knowledge of such defect as existed in this slat floor.

 There is no suggestion that Mr. Nichols was unaccustomed to visiting these ventilator cars and entering them, as he did this one, but the contrary is indicated. The proof is that it was a constant and daily practice for these Nashville commission men to sell from these cars and Mr. Nichols had been a habitual buyer over several years. He knew the bottoms were made of slats of varying widths and with varying interspaces. He knew that the primary purpose in the construction of the floors and other interior parts of thes cars was ventilated transportation, and that any use of the cars as sales rooms, if permitted, was not contemplated in their construction, and that he entered premises intended for use in shipping freight, rather than selling goods. He approached and entered this car on this morning at the door from which he later fell. As he approached the door his head was just above the level of the floor and his eyes had a clear view, at a distance of perhaps two feet, of the identical part of this flooring of which he complains as dangerously defective. Surely, he looked before he entered and one of two conclusions is inescapable,—either there was no such defect as could have carried notice of its existence to the Railroad Company,

or plaintiff was negligent in failing to see it. We think it unnecessary to go further and determine whether or not, as insisted, Nichols was guilty of affirmative contributory negligence in pressing his rubber heel between the slats and thus fastening it; also in standing and handling his body carelessly in the open door of the car, thus exposing himself to danger of falling.

It results that, giving effect to the foregoing rules, applicable to implied invitee cases particularly, we are unable to escape the conclusion that, according to the uncontroverted facts, the plaintiff's knowledge of such defect as existed at least equaled that of the defendant, and he cannot recover. A verdict should have been directed for the defendant Illinois Central Railroad Company. Where the facts are uncontroverted and reasonable minds can draw but one conclusion therefrom, the question is for the Court. *Moody* v. *Gulf Refining Co.,* 142 Tenn., 280, 218 S. W., 817, 8 A. L. R., 1243, and cases cited. Having reached this conclusion, determinative of the case, it becomes unnecessary to consider other questions presented by the Railroad Company.

Consistently with this view and holding, the affirmance by the Court of Appeals of the verdict of the jury in favor of defendants Hobbs Banana Company and others must be affirmed. In addition to what was said by that Court, there was evidence from which the jury might well have found that the defect was as observable to Nichols, the express invitee of the Hobbs Banana Company, as to that Company, and, therefore, he could not recover against the Hobbs Company or the other defendants.

The judgment of the Court of Appeals against the Illinois Central Railroad Company is reversed and the suit dismissed.