Edward L. FOSTER, Appellant,

v.

BAPTIST MEMORIAL HOSPITAL, Appellee.

Court of Appeals of Tennessee, Western Section.

Sept. 17, 1973.

Certiorari Denied by Supreme Court March 4, 1974.

Ricco Gatti, Jr., Memphis, for appellant.

Gavin M. Gentry, Memphis, for appellee; Armstrong Allen Braden Goodman, McBride & Prewitt, Memphis, of counsel.

MATHERNE, Judge.

The plaintiff sues for damages due to personal injuries received as result of two separate incidents brought about by the alleged negligence of the defendant hospital. Incident number one occurred on October 31, 1970, when the plaintiff, while working as an employee of Guardsmark, Inc. and assigned to patrol and guard the defendant's premises, fell down an unlighted elevator shaft. As result of that fall the plaintiff was confined in the defendant hospital suffering from various bruises and abrasions about the body and more particularly with a fracture of the right hip. While so confined in the defendant hospital incident number two occurred on November 14, 1970, when the plaintiff was pulling himself up by the use of a contraption installed over his bed for that purpose and a leather strap holding the device broke causing the plaintiff to fall across the bed and resulted in alleged re-injury and further injury to the fractured right hip.

The trial judge permitted both incidents to be tried at the same time. Under the instructions of the court, the jury returned the following verdict:

"Incident #1—We find in favor of the defendant."

"Incident #2—We find in favor of the plaintiff."

"Award plaintiff $8,000 on Incident #2."

Judgment was entered on the verdict in favor of the defendant on incident number one, and that the plaintiff recover $8,000 of the defendant on incident number two.

The defendant does not appeal. The plaintiff appeals under twenty-five assignments of error. We will not consider all these assignments, but we will consider those assignments directed to the claim there is no material evidence to support the verdict in favor of the defendant as relates to the fall down the elevator shaft. We will also consider Assignment Number VII which is directed to the charge of the trial court relating to the measure or element of damages to which the plaintiff might be entitled. The charge complained of is as follows:

"However, I further instruct you that in assessing the damages as a result of incident number two you must not include any part of Dr. Toom's bill in the amount of $878.00 nor any part of the second hospital bill in the amount of $554.05 nor any part of his past loss of earnings nor any part of the future impairment of earning capacity."

The plaintiff, a guard for Guardsmark, Inc., was assigned by his employer to the defendant hospital. The plaintiff's duties called for regular clockpunch rounds in a certain building from the 16th to the 21st floors. The plaintiff worked the 11:00 p. m. to 7:00 a. m. shift, and these rounds were on the even hours of 12:00 midnight and 2:00, 4:00, and 6:00 a. m. The plaintiff used a service elevator for his regular rounds. The elevator opened into an alley between two buildings of the defendant hospital. This alley was at the best poorly lighted, and the proof establishes the entrance to the elevator was normally in shadow or darkness. A key to the elevator door was kept in the boiler room across the alley from the elevator. The plaintiff would use this key to unlock the door to the elevator when it was locked. At times

the elevator door was locked and at other times unlocked when used by the plaintiff. The light switch on the elevator was across the elevator from the entrance thereto on the alley side. A person would have to enter the elevator from the alley and walk across the elevator to reach the light switch. The defendant hospital had two maintenance men on duty every night. A part of their duties was to make an inspection of equipment on the 20th and 21st floors of the same building. The maintenance men would open the locked elevator door by use of a screwdriver, which fact was known to the plaintiff. Oftentimes the plaintiff would use the elevator with the maintenance men, and the proof fairly establishes the maintenance men knew the regular routine of clockpunch rounds as made by the plaintiff. On October 31, 1970, the plaintiff was making his 4:00 a. m. round and, having picked up the key to the elevator door as normal, he opened the elevator door from the alley, and while looking into absolute darkness, stepped through the elevator door to walk across the elevator and turn on the elevator light switch. This was his normal procedure but on this occasion the elevator was not there because the maintenance men had the elevator at the 20th floor. Consequently, the plaintiff fell about 10 or 12 feet down the elevator shaft and sustained the injuries noted.

■ The facts establish ample material evidence from which the jury could conclude that the direct and proximate cause of the fall down the elevator shaft was the negligence of the plaintiff in stepping into the elevator shaft in absolute darkness. The plaintiff possessed full knowledge of the physical conditions present, and the manner in which the elevator was used. See and compare: Illinois Central R. Co. v. Nichols (1938), 173 Tenn. 602, 118 S. W.2d 213; Park v. Sinclair Refining Co. (1940), 24 Tenn.App. 204, 142 S.W.2d 321; Harden v. Cummings Truck Lease, Inc. (Tenn.App.1972), 494 S.W.2d 512. We see no merit in the many assignments of error

wherein the plaintiff insists the trial judge incorrectly charged the jury, or erroneously refused numerous special requests, as relate to contributory negligence. All assignments of error relating to the jury verdict in favor of the defendant as concern the fall down the elevator shaft are overruled, and the judgment of the trial court in that respect is affirmed.

We will now review the record as relates to the fall caused by the breaking of the leather strap while the plaintiff was a patient in the defendant hospital. The plaintiff's orthopedic surgeon, by deposition, stated the plaintiff suffered a Powell Type 3 fracture of the neck of the right femur when he fell down the elevator shaft. Surgery was performed on November 2, 1970, when the fracture was reduced and the broken parts of the bone were held together by the insertion of a Jewett nail. The leg was not in a cast. About two or three days after the operation the plaintiff was encouraged to begin movement of his body. The plaintiff was on the 8th floor of the defendant hospital, which may be described as the orthopedic ward of the hospital. The beds in the ward were equipped with what may be called an orthopedic frame around and over the bed. From this frame could be suspended or attached various pull-up bars, weights, etc. to be used by the patient. On the plaintiff's bed a pull-up bar was suspended from this frame by two leather straps. The plaintiff was told by the doctors, nurses and attendants to use this pull-up bar to aid his movements of his body.

The day before the accident in question the plaintiff, in the presence of hospital attendant Cox, grasped the pull-up bar to move his body when a strap broke causing the plaintiff to fall about two inches back on the bed. This fall did not seem to hurt the plaintiff, at least he felt no pain. The attendant notified the head nurse of the incident and was told to get another pull-up bar unit from an empty room and to attach it to the plaintiff's bed. This was done, and the entire pull-up unit which broke was removed.

The next day, November 14, 1970, the plaintiff, with the assistance of attendant Cox had, as instructed, removed himself from the bed to a wheelchair. After being up some time the plaintiff tired and called for attendant Cox to assist him back into the bed. The wheelchair was fixed and locked beside the bed, the plaintiff placed his good left foot on the stool beside the bed and with attendant Cox holding his injured right leg, the plaintiff grasped a strap of the pull-up contraption, pulled the entire weight of his body upward in order to pivot onto the bed. At a time when the plaintiff had pulled his body to a position of about 8 inches above the bed and at a 90 degree angle to the bed preparatory to pivoting his body onto the bed, the strap broke and the plaintiff's injured right hip fell across the edge of the bed. The plaintiff instantly experienced severe pain in his right hip.

The only medical testimony offered was the deposition of the plaintiff's orthopedic surgeon, Dr. Tooms. This doctor stated that prior to the fall the plaintiff was making a normal recovery from such an operation. X-rays taken prior to the fall showed the Jewett nail in proper position. X-rays taken immediately after the fall showed "some loss of position at the fracture site." This condition was explained: "* * * the fracture fragments were not being held in exactly the same position as they had been at the time of surgery. There had been some loss of position and also some change in position of the Jewett nail that had been put into hold these fragments still." The doctor also referred to an X-ray showing a lateral view of the fracture after the fall, and stated: "* * * there's also a lateral view made on the same date, which does show an increase in the angle at that fracture site and also shows that this nail is cutting out or moving out of the back side of this femoral head to a considerable greater degree than it did initially." The plaintiff continued to have pain at his right hip. He was discharged from the hospital on November 20, 1970. Numerous X-rays were

made, and Dr. Tooms concluded another operation would have to be performed to remove the Jewett nail because the tip of the nail had moved out of the head or ball of the femur. This operation was performed on May 11, 1972. The plaintiff was discharged by Dr. Tooms about two or three weeks prior to trial.

Dr. Tooms testified a perfect recovery from an operation such as the plaintiff underwent on November 2, 1970 would leave the patient with a 10 percent loss of use of the right leg, and a 5 percent permanent partial disability to the body as a whole. This doctor rated the plaintiff's present disability as 50 percent of the right leg, and 25 percent permanent partial disability to the body as a whole. The doctor stated the plaintiff had obtained his maximum recovery, and his percent disability would not lessen. Dr. Tooms could not say to what extent the fall in the hospital aggravated the plaintiff's prior disability. The doctor did state: "I think I can state that, from all the facts we have available, I think his impairment in all probability is greater because of his fall than it would have been had he not had his fall. I'm afraid I can't give you a good, solid answer as to just exactly how much difference there would have been."

We conclude there is material evidence from which the jury could find that the fall in the hospital did aggravate and increase the permanent partial disability which the plaintiff was suffering at the time, and that the fall thereby resulted in the plaintiff experiencing a greater permanent partial disability of some degree between 10 percent and 50 percent permanent impairment of the right leg.

We hold the rule to be that a tort feasor must accept the injured person as he finds him. If the wrongful act results in the aggravation of, or an increase in, a permanent partial disability existing in the injured party, then it matters not to what extent the wrongful act aggravates or increases that disability; any increase thereof renders the tort feasor liable for all.

Wilson v. Cook Manufacturing Company (1966), 56 Tenn.App. 129, 405 S.W.2d 584. See also: Elrod v. Town of Franklin (1918), 140 Tenn. 228, 204 S.W. 298; Holt v. McCann (1968), 58 Tenn.App. 248, 429 S.W.2d 441. The jury should have been so charged.

On this issue the trial judge charged the jury:

"If you find for the defendant in regard to incident number one, and for the plaintiff on incident number 2, then you should ascertain the amount of damages sustained by the plaintiff *only* as a result of incident number 2 in accordance with the instructions on damages I have previously given you.

"However, I further instruct you that in assessing the damages as a result of incident number 2 you must not include any part of Dr. Toom's bill in the amount of $878 nor any part of the second hospital bill in the amount of $554.05 nor any part of his past loss of earnings nor any part of the future impairment of earning capacity." (Emphasis added)

 For the reasons heretofore set out, the charge as quoted is error. Assignment of Error VII is sustained, and this cause is remanded for a new trial. This remand is not ordered because the verdict is inadequate; we do not pass on that issue. The remand is ordered because the jury was improperly charged on the measure of damages, and it could not have properly assessed the plaintiff's damages under the charge as given. If the jury finds the wrongful act increased the preexisting permanent disability of the right leg to any degree, the jury fixes damages for the whole. In so doing the jury is not speculating nor basing its verdict on conjecture or surmise, because the *extent of the increase* in the permanent injury is of no significance.

The jury has settled the issue of liability. There is no need, and it would be improper, to re-try that issue. This remand is accordingly limited to a retrial of the issue of damages only. The error requiring the retrial has no bearing on the other issues as determined by the jury. See and compare Acuff v. Vinsant (1969), 59 Tenn.App. 727, 443 S.W.2d 669, and the authorities therein cited.

On the new trial of the amount of damages, if any, to which the plaintiff is entitled, the medical expenses, loss of earnings, and pain and suffering experienced by the plaintiff prior to the breaking of the pullbar strap are not admissible.

The costs to date in the Trial Court and in this Court are adjudged against the defendant. The cost of the new trial shall be there adjudged.

CARNEY, P. J., and NEARN, J., concur.