FILED
01/08/2025
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
December 6, 2023 Session Heard at Martin[1]

## ROBERT L. TRENTHAM v. MID-AMERICA APARTMENTS, LP ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Williamson County**
**No. 19CV-414     Michael W. Binkley, Judge**

—————————————————————

**No. M2021-01511-SC-R11-CV**

—————————————————————

SARAH K. CAMPBELL, J., dissenting.

Premises owners "are not insurers of their patrons' safety." *Blair v. W. Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004). That refrain has been part of Tennessee's tort law for nearly a century. *See, e.g.*, *Ill. Cent. R.R. v. Nichols*, 118 S.W.2d 213, 217 (Tenn. 1938). Accordingly, to impose a duty on a premises owner to remedy or warn against unsafe conditions created by others, a plaintiff must establish that the premises owner had actual or constructive knowledge of the unsafe condition. Until today, constructive knowledge required proof either that (1) the unsafe condition had existed long enough for a reasonable premises owner to discover it, or (2) a similar condition had occurred in the past, making it reasonably foreseeable that it would occur again. *See Blair*, 130 S.W.3d at 765–66. The majority opinion creates a third category that has no footing in our existing precedents. It holds that premises owners also owe entrants a duty to protect against an unsafe condition on the property when it is "reasonably foreseeable that an unsafe condition [will] arise" on the premises "without proper maintenance." The majority's holding is contrary to *Blair* and other binding precedents, creates confusion for premises owners and lower courts, and exposes premises owners to expansive new liability. I respectfully dissent.

I.

A.

Robert Trentham leased an apartment at the Venue, an apartment complex in Franklin, Tennessee, owned and operated by Mid-America Apartments, L.P. An avid exerciser, Trentham used the Venue's fitness center five or six times per week. The shortest

———————————

[1] Oral argument was heard in this case on the campus of the University of Tennessee at Martin as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

route from Trentham's apartment to the fitness center crossed a wooden pedestrian bridge. Trentham nearly always returned to his apartment from the fitness center using that route, but he sometimes took a longer route that did not cross the bridge on his way to the fitness center to warm up for his workout.

One morning in September 2018, Trentham slipped and fell on the pedestrian bridge while returning from the fitness center to his apartment. The bridge was wet. It was not raining hard at the time of the fall, but it had rained the previous night and may still have been drizzling. Trentham crossed the bridge without holding onto the side. He had his phone in his hand and possibly his iPad too. Trentham could not recall whether he crossed the bridge on his way to the fitness center earlier that morning.

Trentham's left leg landed underneath him when he fell, and he could not get up. Cameron Townsend, a Mid-America employee, was nearby when Trentham fell. Trentham called out for help, but even with Townsend's assistance he was unable to get to his feet.[2] When paramedics eventually arrived, they placed Trentham on a stretcher and took him to a hospital.

Trentham suffered a tear in his left quadriceps. He had two surgeries to repair the tear, but both were unsuccessful. At the time of trial, Trentham was considering a third attempt at surgical repair.

According to Trentham, the bridge was as "slick as ice" at the time of his fall. He recalled that "algae" or "some other slimy substance" was coating the bridge. Although Trentham had crossed the bridge many times before, he had never noticed a slick substance on its surface previously. And it is undisputed that Mid-America was not actually aware of any hazardous condition on the bridge before Trentham's fall.

An expert hired by Trentham—Dr. J. Harold Deatherage—reviewed photographs of the bridge taken shortly after the accident. Because the photos were dark, Dr. Deatherage could not be certain what was on the bridge. But Dr. Deatherage testified that, when pressure-treated wood is exposed to the elements, it will develop a "microbial growth" that creates "a slick surface." He concluded that, because the bridge had not been regularly cleaned, it was more likely than not that it grew "mold and algae" and that this growth caused the bridge to become slippery. He described algae as a "clear substance" that could be "overlooked" or "easily missed" by a layman.

Mid-America regularly inspected the grounds of the Venue, including the bridge. In fact, Mid-America's Regional Vice President, Elizabeth Phillips, had inspected the property only six days before Trentham's fall. Ms. Phillips did not notice any problems

---

[2] Townsend, who was not called as a witness, did not slip on the bridge while assisting Trentham.

with the bridge during that inspection or any previous ones. Nor had any other employee ever observed algae or mold accumulating on the bridge before Trentham's fall. Ms. Phillips testified that "the protocol" at Mid-America was to pressure wash walkways and other surfaces "at least once a year" or more frequently if needed to address "safety" or "aesthetics" issues. But Mid-America presented no evidence that the bridge was pressure washed in the year preceding Trentham's fall.

B.

Trentham sued Mid-America, alleging that it negligently maintained the wooden bridge and was responsible for his injuries. Following a bench trial, the trial court ruled in Trentham's favor. The trial court credited Trentham's account of the accident. It concluded that Trentham had enough "normal life experiences" to "distinguish[] the slick and slimy natural growth from water alone." The court also credited Dr. Deatherage's opinion that the bridge was likely covered in algae and that a failure to clean pressure-treated wood can result in microbial growth. The court therefore found that a dangerous condition—"namely, a slick, organic growth on the wooden planks"—existed on the bridge.

The trial court further concluded that Mid-America owed Trentham "a duty to act reasonably to remove, repair, or warn against the slimy substance." The court noted that, under *Blair v. West Town Mall*, a plaintiff may prove that a premises owner had constructive notice of a dangerous condition "by showing a pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence." 130 S.W.3d 761, 765–66 (Tenn. 2004). Even though it was undisputed that Mid-America "had received no complaint or report about the bridge until [Trentham's] fall," the court found that Mid-America had constructive knowledge of the condition because it was caused by "natural forces" and therefore was "reasonably foreseeable" to Mid-America. Finally, the court balanced the risk of harm presented by the condition against the burden Mid-America would incur if it took steps to prevent the harm. And it concluded that the scales tipped in favor of imposing a duty on Mid-America.

As for the remaining elements of Trentham's negligence claim, the trial court concluded that Mid-America breached its duty "by failing to regularly inspect, maintain, clean, or treat the footpath of the bridge" and that this breach was the primary cause of Trentham's fall. The trial court awarded Trentham approximately $2 million in damages.

The Court of Appeals affirmed. *Trentham v. Mid-America Apartments, LP*, No. M2021-01511-COA-R3-CV, 2023 WL 163547, at *1 (Tenn. Ct. App. Jan. 12, 2023). With respect to duty, the court agreed with the trial court that Mid-America had constructive knowledge of the slimy substance on the bridge. *Id.* at *8. The appellate court noted the trial court's reliance on "admissions by [Mid-America's] witnesses that the bridge was required to be washed on a regular basis in order to prevent microbial growth and that such

cleanings had not occurred." *Id.* It concluded that the trial court's finding that Mid-America had constructive knowledge of the dangerous conduction was "supported by a preponderance of the evidence." *Id.*

We granted Mid-America's application for review to determine whether it owed Trentham a duty of care with respect to the slippery condition on the bridge.

## II.

The majority holds that Mid-America owed Trentham a duty to prevent the slippery growth on the bridge because it was "reasonably foreseeable that an unsafe condition would arise" on the premises if Mid-America did not perform "proper maintenance." The majority grounds its decision in *Blair*. *Blair* held that plaintiffs may establish constructive notice by pointing to "a pattern of conduct, a recurring incident, or a general or continuing condition" that shows the development of the dangerous condition at issue was "reasonably foreseeable to the premises owner." *Blair*, 130 S.W.3d at 765–66. In the majority's view, the slippery growth at issue here qualifies as "a general or continuing condition" of the property. I do not think *Blair* stretches so far. I would hold that Mid-America did not owe Trentham a duty because it lacked actual or constructive knowledge of the dangerous condition on the bridge.

I begin with a summary of the legal framework that governs premises liability actions in Tennessee. I then explain why the majority's analysis is inconsistent with *Blair* and other binding precedents. Finally, I discuss some practical problems created by the majority's approach.

### A.

Duty is an indispensable element of any negligence action, including premises liability claims. *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008). Whether a duty exists is a question of law that we review de novo. *Id.*

Property owners owe entrants a "general duty of due care" and must "exercise due care under all the circumstances." *Parker v. Holiday Hosp. Franchising, Inc.*, 446 S.W.3d 341, 350 (Tenn. 2014). This general duty of care arises in part from the property owner's superior ability to discover defects and hazards on the property. *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980). Owners are presumed to be familiar with their land, while entrants ordinarily occupy the premises for only a short time and are poorly situated to rigorously inspect the premises before entry. *See Nichols*, 118 S.W.2d at 217 ("Liability is grounded on the *superior knowledge* of the owner of the danger to the invitee."). By opening the premises to the public, owners implicitly represent that the premises are reasonably safe. Because of this implicit representation and the owner's superior

familiarity with the premises, the owner "is the person normally best able to prevent any harm to others." *McCormick*, 594 S.W.2d at 387.

Yet property owners are not "insurers of their patrons' safety." *Parker*, 446 S.W.3d at 350 (quoting *Blair*, 130 S.W.3d at 764); *see also McCormick*, 594 S.W.2d at 387 ("[P]ossessors of land are not insurers of the safety of invitees."); *Nichols*, 118 S.W.2d at 217 (stating that a property "owner is not an insurer, even when the visitor is an invitee"). A property owner's duty to remedy or warn against dangerous conditions extends only to those conditions the owner knew about or could have discovered with reasonable care. *See Rice v. Sabir*, 979 S.W.2d 305, 309 (Tenn. 1998) (stating that the property owner's duty of care "does not include the responsibility to remove or warn against 'conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable care'" (quoting W. Page Keeton et al., *Prosser & Keeton on Torts* § 61 (5th ed. 1984))).

To establish that a property owner had a duty to remedy or warn against a specific dangerous condition, a plaintiff must show either that (1) "the condition was caused or created by the owner, operator, or his agent," or (2) "if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident." *Blair*, 130 S.W.3d at 764. Here, it is undisputed that Mid-America did not have actual notice of the slippery substance on the bridge. Trentham instead argued—and the lower courts found—that Mid-America had constructive notice of the condition's existence.

We have defined "constructive notice" as "knowledge of a fact imputed by law to a person . . . because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it." *Parker*, 446 S.W.3d at 351 (quoting *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 15 (Tenn. 1997)). Constructive notice asks whether a property owner exercising reasonable diligence and inspection practices *should* have known about a hazard on the property. *See Hawks*, 960 S.W.2d at 15 (stating that a party "will be charged with constructive notice of a fact or information, if the fact or information could have been discovered by reasonable diligence and the [party] had a duty to exercise reasonable diligence to inquire into the matter"); *Paradiso v. Kroger Co.*, 499 S.W.2d 78, 80 (Tenn. Ct. App. 1973) ("[C]onstructive notice requires some material competent evidence from which it can be logically inferred the proprietor, by the exercise of ordinary care, would have or should have discovered the dangerous condition."). Although we have previously suggested that constructive notice must be proved *in addition to* the traditional elements of negligence, *Parker*, 446 S.W.3d at 350, the majority correctly clarifies that notice is not an additional element but instead part and parcel of the duty element.

*Blair* provides the governing framework for establishing constructive notice in premises liability actions. Before *Blair*, Tennessee employed the "durational approach" to determine whether a property owner had constructive notice of a dangerous condition created by a third party. Under that approach, a plaintiff was required to present evidence that a "dangerous or defective condition existed for such a length of time that the defendant, in the exercise of reasonable care, should have become aware of the condition." *Blair*, 130 S.W.3d at 764. Absent proof that the condition had existed long enough for the defendant to become aware of the condition, a plaintiff could not recover.

The plaintiff in *Blair* sought to proceed under a more lenient approach known as the "method of operation" theory. *Id.* Although our Court had not previously adopted that approach, the Court of Appeals had endorsed two distinct versions of the theory. *Id.*

Under the first version, a plaintiff did not need to establish notice *at all* when the defendant's method of operation caused the dangerous condition. *Id.* (citing *Hale v. Blue Boar Cafeteria Co.*, 1980 WL 150173, at *4 (Tenn. Ct. App. Feb. 21, 1980)). In *Hale*, the plaintiff was injured when she fell in the self-service area of a cafeteria where spills were common. *Hale*, 1980 WL 150173, at *2. The Court of Appeals reasoned that, "[i]f a proprietor of a place of business need not have notice of a defective condition caused by it or any of its employees, it appears logical not to require notice of a hazardous situation created by the method in which the proprietor chose to operate its business." *Id.* at *4.

Under the second version of the method-of-operation theory, actual or constructive notice was still required. *Blair*, 130 S.W.3d at 765 (citing *Beske v. Opryland USA, Inc.*, 923 S.W.2d 544, 546 (Tenn. Ct. App. 1996)). But it could be established by proof that the defendant's method of operation caused the dangerous condition and that the condition was a "common occurrence" on the premises. *Beske*, 923 S.W.2d at 546. The plaintiff in *Beske* slipped on spilled water near a turnstile leading to the Opryland train station. *Id.* Opryland did not allow drinks on the train, so visitors had to discard them by the turnstiles. *Id.* Evidence at trial showed that "[m]anagement was aware that spilled beverages were a common occurrence at the entrance to the turnstiles." *Id.* The court held that the defendant had constructive notice of the dangerous condition because the spill that caused the plaintiff's fall was a "common occurrence." *Id.*

We considered these two "differing approaches" in *Blair*. 130 S.W.3d at 764–66. We rejected the first approach from *Hale* and adopted a slightly altered version of the approach from *Beske*. *Id.* We reiterated "a principle firmly established in our case law—that a premises owner's duty to remedy a condition, not directly created by the owner, is based on that owner's actual or constructive knowledge of the existence of the condition." *Id.* at 766. But to "relieve[] plaintiffs of the difficult burden of showing the duration of a particular occurrence," we held that a plaintiff alternatively "may prove that a premises owner had constructive notice of the presence of a dangerous condition by showing a

pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence." *Id.* at 765–66. We dispensed with *Beske*'s "method of operation" label, however, because it incorrectly "suggest[ed] that the owner's method of operation, or way of doing business, is a part of the inquiry." *Id.* at 766. The key question instead is "whether the condition *occurs so often* that the premises owner is put on constructive notice of its existence." *Id.* (emphasis added).

*Blair* also clarified that the cause of the dangerous condition is immaterial. Whether "caused by the owner's method of operation, by a third party, or by natural forces," the property owner is on constructive notice whenever "a past history of a recurring event or condition makes that event or condition foreseeable." *Id.* This holding was "not novel." *Id. Blair* "simply recognize[d] the logical conclusion that, *when a dangerous condition occurs regularly*, the premises owner is on constructive notice of the condition's existence." *Id.* (emphasis added). In other words, *Blair* clarified that when a dangerous condition had occurred frequently on the property in the past, a property owner should know that a similar condition could develop on the premises again in the future.

B.

The majority holds that a duty exists whenever "the presence of a dangerous condition" was "reasonably foreseeable to the premises owner," even if there is no evidence that the condition had existed long enough for the property owner to discover it and even if the condition had never occurred previously. According to the majority, *Blair*'s "general or continuing condition" category includes "situations like this one, in which it is reasonably foreseeable that an unsafe condition [will] arise without proper maintenance."

Respectfully, this holding is impossible to reconcile with *Blair*. The standard we adopted in *Blair* is grounded in the bedrock principle that "a premises owner's duty to remedy a condition, not directly created by the owner, is based on that owner's actual or constructive knowledge *of the existence of the condition*." 130 S.W.3d at 766 (emphasis added). *Blair* simply "recognize[d] the logical conclusion that, *when a dangerous condition occurs regularly*, the premises owner is on constructive notice of the condition's existence." *Id.* (emphasis added). *Blair* never hinted that reasonable foreseeability of unsafe conditions generally is enough to establish constructive notice. To the contrary, *Blair* firmly tied constructive notice to the recurring nature of the unsafe condition: "The question is *whether the condition occurs so often* that the premises owner is put on constructive notice of its existence." *Id.* (emphasis added).

The majority attempts to shoehorn the facts of this case into *Blair* by concluding that the slippery substance on the bridge "was a 'general or continuing condition' that was reasonably foreseeable to the premises owner." This logic suffers from at least two flaws. *First*, it flips the *Blair* standard on its head. Under *Blair*, it is the *past existence* of a "general

or continuing condition" that gives a property owner constructive notice of a later-occurring dangerous condition. The majority instead concludes that Mid-America has constructive notice merely because it was *reasonably foreseeable* that a general or continuing condition may occur. *Second*, it unmoors the "general or continuing condition" category from the dangerous condition actually at issue. On the majority's view, knowledge that some unspecified category of unsafe conditions may occur if maintenance is not performed suffices to give the property owner constructive knowledge of *any dangerous condition* that in fact occurs. It makes sense to impute knowledge to a premises owner when the same or a similar unsafe condition has occurred previously. But there is no logical reason to impute knowledge of a specific unsafe condition based on generic unsafe conditions, let alone hypothetical generic unsafe conditions that have not actually occurred.

Given *Blair*'s emphasis on the recurring nature of the condition, its reference to a "general or continuing condition" is best understood to mean a dangerous condition that *has actually occurred previously in a general or continuing manner*. In *Blair*, we remanded the case to allow the trial court "to determine whether the slick spot in the area of the parking lot where Plaintiff fell was part of a pattern of conduct, a recurring incident, or a general or continuing condition indicating the slick spot's existence." 130 S.W.3d at 767. Testimony that the parking lot was *generally* or *continually* slick would help the plaintiff prevail in such a case. If others had observed that the parking lot was generally slick, then the court could reasonably conclude that the premises owner had constructive notice of the dangerous condition, even if the plaintiff could not prove the duration of the particular slick spot that caused the plaintiff to fall.

Here, Trentham was unable to prove either the duration of the particular slippery substance that caused his fall or that the bridge or the larger property generally experienced algae growth that made surfaces slick. Though Trentham crossed the bridge almost daily to get to the gym, he testified that he had never noticed a slippery substance on the bridge until the moment of his fall. Mid-America's Regional Vice President, Elizabeth Phillips, inspected the property only six days before Trentham's fall, but neither she nor any other employee noticed algae or mold accumulating on the bridge during that inspection or previous ones. To be sure, algae growth could constitute a general or continuing condition, but there is no evidence that such a condition existed anywhere at the Venue, never mind the specific bridge where Trentham fell.

Like the trial court and the Court of Appeals, the majority relies almost exclusively on Phillips's testimony to support its conclusion that the company had constructive knowledge of the bridge's dangerous condition. Based on that testimony, the majority reasons that Mid-America "should have known that failure to pressure wash for over a year would likely lead to the occurrence of a general unsafe condition." At best for Trentham, that testimony establishes only that a failure to pressure wash the bridge *could lead* to the

development of some unspecified unsafe condition. It does not establish that algae growth—or any unsafe condition, for that matter—had occurred in the past when pressure washing was not performed according to schedule. There is simply no evidence in this case to support the majority's conclusion that Mid-America had constructive notice of the slippery substance on the bridge.

The majority claims that this case is analogous to *Williams v. Linkscorp Tennessee Six, L.L.C.*, which involved a slip and fall on a golf course. 212 S.W.3d 293 (Tenn. Ct. App. 2006). The plaintiff in *Williams* was injured after slipping on stairs made of railroad cross ties. *Id.* at 294. It was raining when the plaintiff fell, and the plaintiff produced evidence that the stairs were muddy and covered in moss. *Id.* at 295–96. Another golfer had previously slipped on similar steps elsewhere on the golf course, and that earlier slip and fall led to an earlier unrelated lawsuit. *Id.* at 295. On these facts, the Court of Appeals held that "[g]iven the slippery nature of [the] moss and the time required for it to grow," a rational jury could have concluded that the moss constituted a dangerous condition, and that "the condition[] of the stairs was 'a general or continuing condition'" that established constructive notice. *Id.* at 296 (quoting *Blair*, 130 S.W.3d at 765).

The majority acknowledges that there are "two significant factual distinctions between *Williams* and [this] case" but deems them immaterial. In fact, the distinctions between this case and *Williams* are highly material. *First*, someone had previously been injured on the defendant's property after slipping and falling on similar stairs. This past occurrence is significant—if not dispositive—under the *Blair* framework. *Second*, the majority in *Williams* found that the moss on the stairs would have required time to grow. *Id.* at 296. Evidence that the dangerous condition had existed for a period of time is highly relevant under the durational approach to proving constructive notice, which remains viable after *Blair*. *Blair*, 130 S.W.3d at 766 n.1. Here, by contrast, there is no evidence that anyone had fallen on the bridge or a similar bridge previously, and there is no evidence that the slippery substance had been there for any significant amount of time. *Williams* does not support the majority's conclusion. In any event, *Williams* is a Court of Appeals decision that does not bind this Court.

## C.

The majority's approach is also inconsistent with other of this Court's precedents. We have explained that "foreseeability alone does not create a duty to exercise reasonable care." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008). Not so anymore. Under the majority's approach, the mere foreseeability that a dangerous condition *could occur*—even if it has never occurred in the past—is enough to impose a duty. But to the extent our past cases consider foreseeability in deciding whether to impose a duty, it is only one factor among many other relevant considerations. *See, e.g.*, *Satterfield*, 266 S.W.3d at 367–69 (considering seven factors in addition to the "foreseeable probability of the harm

or injury occurring" when determining whether to impose a duty of care); *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 902 (Tenn. 1996) (recognizing a duty to protect customers where a business "knows, or has reason to know, either from what has been or should have been observed or from past experience, that criminal acts against its customers on its premises are reasonably foreseeable" and balancing "foreseeability of harm and the gravity of harm" against "the commensurate burden imposed on the business to protect against the harm"); *Rice*, 979 S.W.2d at 308 (balancing "the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm"). Here, the majority holds that a property owner's duty can arise from foreseeability alone. It makes no effort to determine the "probability of the harm or injury occurring," *Satterfield*, 266 S.W.3d at 367–69, or the burden imposed on the premises owner by requiring it to prevent the harm, much less to balance those considerations.

The majority's approach is also inconsistent with the standard we adopted in *McClung v. Delta Square Ltd. Partnership* for cases involving a premises owner's failure to protect against the criminal acts of third parties. 937 S.W.2d 891 (Tenn. 1996). We pointed to this standard in *Blair*, noting that our holding in *Blair* was "not novel" because we had "previously recognized" in *McClung* "the basic idea that a past history of a recurring event or condition makes that event or condition foreseeable." 130 S.W.3d at 766.

In *McClung*, we considered whether business owners owed patrons a duty to prevent third-party criminal acts that had occurred on the business's property. 937 S.W.2d at 893. Some courts had used a prior incidents rule, which required plaintiffs to produce "evidence of prior incidents of crime on or near defendant's premises in order to establish foreseeability." *Id.* at 899. Other courts chose a totality-of-the-circumstances approach that considered "the nature or character of the business, its location, and prior incidents of crime, if any." *Id.* at 900. After noting perceived deficiencies in both approaches, we adopted our own middle-of-the-road approach to foreseeability that balanced "the foreseeability of harm and the gravity of harm" against "the commensurate burden imposed on the business to protect against that harm." *Id.* at 902. But we noted that this was a high bar, and that "the requisite degree of foreseeability essential to establish a duty to protect against criminal acts *will almost always require that prior instances of crime have occurred on or in the immediate vicinity of defendant's premises*." *Id.* (emphasis added). "To hold otherwise," we elaborated, "would impose an undue burden upon merchants." *Id.*

We viewed our holding in *Blair* as consistent with this "basic idea that a past history of a recurring event or condition makes that event or condition foreseeable." 130 S.W.3d at 766. The majority's holding severs that link. Now, in an ordinary premises liability case, the plaintiff need not point to prior instances of a dangerous condition to establish that the condition was reasonably foreseeable. It is enough to show that the defendant knew that

- 10 -

*something* unsafe might happen if it did not take preventative measures. As we warned in *McClung,* this approach risks "impos[ing] an undue burden" on property owners. 937 S.W.2d at 902.

Finally, the majority's conclusion is hard to square with our decision in *Parker v. Holiday Hospitality Franchising, Inc. See* 446 S.W.3d 341 (Tenn. 2014). In *Parker*, the plaintiff was injured after he sat on a defectively installed shower bench in a hotel room. *Id.* at 344. The bench collapsed due to a defect that was "concealed by a sheetrock wall," but "could have been discovered if the shower bench installation had been inspected . . . before the sheetrock wall was installed." *Id.* at 345. As relevant here, the plaintiff asserted a premises liability claim against the hotel's owner and operator. *Id.* at 343–45.

The key question in *Parker* was whether the hotel owner had constructive notice of the defective shower bench. *Id.* at 351. We said no. *Id.* at 352. At the threshold, we noted that property owners are "not liable for injuries occasioned by latent defects which are either concealed in defective workmanship or are incidental to the ordinary wear and tear of houses and of which the owner had no notice." *Id.* at 350 (quoting *Allen v. Saturn Corp.*, No. M2002–01238–COA–R3–CV, 2003 WL 22055959, at *5 (Tenn. Ct. App. Sept. 4, 2003)). We found it consequential that the owner had received no complaints about the shower bench that injured the plaintiff or "any of the other shower benches at the [h]otel." *Id.* at 352. Further, there were no past similar accidents on the property—none of the other shower benches at the hotel had previously collapsed. *Id.* And critically, we stated that the defect in the bench "was not visible to [the owner] or any [h]otel staff after construction was completed," and previous "visible inspections *and* physical pressure tests of the shower bench by the [h]otel maintenance man and the [plaintiffs] the evening before it collapsed failed to reveal any problems." *Id.* Accordingly, even though the defect "existed for approximately four years prior to the accident," we held that the "measures that would have been required to discover the defect . . . [were] far beyond the parameters of what the duty of reasonable care requires of property owners." *Id.*

If the defendant in *Parker* had no duty to remedy or warn against the defective shower bench, it is hard to see why Mid-America should have a duty here. Like the defendant in *Parker*, Mid-America never received any complaints about the dangerous condition at issue. Although it inspected the property regularly, it did not discover the issue and likely could not have discovered the issue given that it would be difficult for a layman to detect. And no similar condition had occurred elsewhere on the property. The majority's attempt to distinguish *Parker* is unavailing.

Mid-America and its amici urge this Court to overrule *Blair* in part or at least clarify what we meant by "general or continuing condition." The majority rejects this invitation, finding no evidence that the standard has "proven unworkable" or has caused confusion.

In reality, the Court of Appeals has been all over the map in its efforts to faithfully apply *Blair*. Some panels have held that past conditions must be similar in cause and location to establish constructive knowledge. *See, e.g.*, *Katz v. Sports Auth. of Metro. Gov't of Nashville & Davidson Cnty.*, No. M2016-01874-COA-R3-CV, 2017 WL 3741346, at *4 (Tenn. Ct. App. Aug. 29, 2017) ("Although not explicitly stated in *Blair*, an element of the inquiry appears to be the proximity between where the dangerous condition occurred previously and where the plaintiff suffered his or her injury."); *Mitchell v. City of Franklin*, No. M2021-00877-COA-R3-CV, 2022 WL 4841912, at *12 (Tenn. Ct. App. Oct. 4, 2022) ("We 'look for evidence concerning whether the dangerous condition previously occurred at the same place or near where the plaintiff was injured.'" (citations omitted)). Other panels have allowed plaintiffs to establish constructive notice with proof that a similar condition occurred previously anywhere on the defendant's property. *See, e.g.*, *Williams*, 212 S.W.3d at 296 (holding that defendant had constructive notice when someone had previously fallen on a different set of stairs). And still other panels—including the court below—have found constructive notice based on foreseeability alone with no evidence that a similar condition had occurred previously. *See Trentham*, 2023 WL 163547, at *8; *see also, e.g.*, *Frazer v. Horton Automatics*, No. E2006-00102-COA-R9-CV, 2006 WL 3001013, at *7 (Tenn. Ct. App. Oct. 23, 2006) (holding that the defendant owed plaintiff a duty to ensure its automatic doors did not close too quickly despite a lack of past accidents).

Rather than clarify *Blair* and provide guidance to lower courts, the majority opinion compounds the existing confusion. Although the majority purports to leave *Blair* intact, it in fact calls *Blair*'s entire framework into question by allowing plaintiffs to establish a duty with *no evidence whatsoever* of any past condition. Under the majority's reasoning, every property owner with regular maintenance practices will be saddled with a duty to remedy and warn against all conceivable unsafe conditions. After all, Mid-America's failure to follow its "protocol" to annually pressure wash the bridge for general "safety" and "aesthetic" reasons was enough for the majority to determine Mid-America had constructive knowledge of algae growth on the bridge.[3] Amici curiae for Mid-America

---

[3] In an attempt to show the reasonableness of its holding, the majority offers the example of a grocery store owner who is aware that, "at grocery stores across Tennessee, customers regularly spill cans of soda in the beverage aisle, creating slippery and unsafe conditions," and on that basis "implements a policy requiring her employees to clean the floor in the beverage aisle at least once per hour." But this case is a far cry from that example. There is no evidence that Mid-America was aware of rampant algae growth on untreated surfaces at Tennessee apartment complexes, let alone that it implemented its pressure-washing

argue that ruling for Trentham in this case will create a "perverse incentive" for "owners to abandon maintenance procedures, even of the most general sort." Whether or not the majority opinion actually leads owners to abandon maintenance protocols, it undoubtedly exposes property owners to new liability and comes dangerously close to making property owners "insurers of their patrons' safety." *Blair*, 130 S.W.3d at 764.

*     *     *

Trentham's injury was life-altering and unfortunate. But it was not produced by a dangerous condition that Mid-America knew about or had reason to know about. Because the majority's holding is inconsistent with *Blair* and other premises liability precedents, I respectfully dissent.

_____
SARAH K. CAMPBELL, JUSTICE

---

policy to address that specific concern. The majority's holding here instead rests on Mid-America's general policy of pressure washing surfaces annually to address vague "safety" and "aesthetic" concerns.